**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **TERENCE VALORE, et al.,** ) | |
| Plaintiffs, ) | |
| v. ) | Case No.: 03-CV-01959 (RCL) |
| **THE ISLAMIC REPUBLIC OF IRAN, et al,** ) | |
| Defendants. ) | |

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
CONCERNING COUNTS XXV-XXVIII
(Estate of James Glenn Yarber)**

This is an action brought pursuant to 28 U.S.C. § 1605A seeking damages for the wrongful death of soldier James Glenn Yarber who died on October 23, 1983 at the United States Marine Barracks in Beirut, Lebanon. In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marines' administrative headquarters building. That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others. It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War. The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages. See, e.g., Glenn E. Dolphin, 24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon (2005); Eric Hammel, The Root: The Marines in Beirut August 1982 – February 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a very recent opinion of this Court, see In re: Islamic Republic of Iran Terrorism Litigation, Nos. 01-CV-2094 et al., 2009 WL 3112136 (D.D.C. September 30, 2009) as well as in the U.S. Congressional Research Service's Suits Against Terrorist States by Victims of Terrorism (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

In Valore v. Islamic Republic of Iran, 478 F.Supp.2d 101, 110 (D.D.C. 2007), this Court found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983. In that opinion, this Court also found that the surviving family members have suffered and will continue to suffer mental anguish and loss of society. Id. See also Peterson v. Islamic Republic of Iran, 264 F.Supp.2d 46, 61 (D.D.C. 2003).

On August 14, 2006, Plaintiffs filed a motion seeking to extend the Amended Administrative Plans Governing Appointed Special Masters in the matters captioned Peterson v. The Islamic Republic of Iran, Civil Action No.: 1:01CV02094 and Boulos v. The Islamic

Republic of Iran, Civil Action No.: 1:01CV02684 to the instant matter.  The motion was granted on March 30, 2007 and the undersigned was appointed Special Master in the matter captioned Terance Valore, et al. v. The Islamic Republic of Iran, et al., Civil Action No. 1:03CV01959.

Paragraph 4 of the Amended Administrative Plan Governing Appointed Special Masters directed that:

> [t]he special masters appointed under this plan shall consider all issues related to damages as to each claim made by Plaintiffs.  They are to be guided as to admissibility of evidence by the Federal Rules of Evidence, however, it shall not be necessary for documents to be qualified as genuine pursuant to Federal Evidentiary Rule 901 . . . The special masters shall be guided in reviewing and evaluating damage claims by this Court's opinions in Flatow v. Islamic Republic of Iran, 999 F. Supp.2d 1 (D.D.C. 1998); Eisenfield v. Islamic Republic of Iran, 172 F. Supp.2d 1 (2000) and Jenco v. Islamic Republic of Iran, 154 F. Supp.2d 27 (2001).

It also required that "each master shall, as to each claim referred to him, submit a report to the Court containing findings of fact and conclusions of law regarding damages.  The report shall contain an evaluation of each item of damages.  Id. at ¶6.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. James Glenn Yarber was born on November 24, 1945 and at all times was a United States citizen.

2. On October 23, 1983, the Marine Barracks housing Mr. Yarber's Marine Battalion in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

3. At the time of the bombing, Mr. Yarber was present in the Marine Barracks building.

    4.      As a result of the explosion, Mr. Yarber suffered severe injuries resulting in his death.

    5.      The official service death certificate (Report of Casualty), admitted as an official record, attributed Mr. Yarber's death to the terrorist attack at Beirut, Lebanon on October 23, 1983.

As discussed more fully below, as a result of Mr. Yarber's death, his estate suffered a loss of accretions which could have been expected to occur during the course of his anticipated life. These losses are set out in a report submitted under oath by Dr. Jerome Paige which is appended hereto. In addition, as a result of Mr. Yarber's death, his family has suffered and will continue to suffer severe mental anguish and the loss of society. The testimony has clearly established that they have never recovered from the shock of their loss. The emotional trauma they sustained is permanent and significant.

Evidence in this action was elicited from James Yarber's widow, Jutta Yarber, his two children from a previous marriage, Deborah Yarber and Robert Yarber, and his three siblings, Alene Masterson, Hazel Renton and Clifford Yarber.[1] Jutta Yarber is the duly appointed representative of her husband's estate for the purpose of this lawsuit.

**Testimony of Jutta Yarber – James Yarber's Wife**

Jutta Yarber was born on September 10, 1962 in Wertheim, Germany. She is a legal, permanent resident of the United States. Jutta and James had one child together, a son named David. During her testimony, Ms. Yarber described James Yarber's family, noting that he had

---

[1] David Yarber, Jutta and James Yarber's son, is a claimant in this action. He has not, however, supplied any testimony, affidavit or declaration in support of his claim. As such, it will not be considered. See 28 U.S.C. § 1608(e) (In an action over which subject matter jurisdiction exists by virtue of the "terrorism exception" of 28 U.S.C. § 1605A, "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court"). In default judgment cases, such as this, plaintiffs may present such evidence in the form of affidavits or declarations rather than through live witnesses testifying in open court. Bodoff v. Islamic Republic of Iran, 424 F.Supp.2d 74, 82 (D.D.C. 2006); Campuzano v. Islamic Republic of Iran, 281 F.Supp.2d 250, 268 (D.D.C. 2003).

two sisters, Patty and Alene, a half-sister, Helen and a half-brother, Jack.  Mr. Yarber's parents, Lee and Mae Ford were deceased at the time James and Jutta married in 1980.  Ms. Yarber also indicated that James Yarber was married previously to Jennifer Brewer.  He had a son, Robert and a daughter, Debra by his first wife.

Ms. Yarber testified that she met James Yarber in 1979 when she was 16 years old.  At the time, James Yarber was a Marine stationed in Wertheim, Germany.  Jutta "was hitchhiking home and he gave her a lift."  Ms. Yarber recalled seeing Mr. Yarber two days later at a local restaurant, talking for a while and exchanging telephone numbers.  A few days later, Mr. Yarber called to ask her out on a date for the following Saturday.

On her seventeenth birthday, James Yarber asked Jutta's father for permission to marry his daughter.  Her father declined, insisting the two wait until Jutta turned 18.  Jutta and James did wait and were married two weeks after Jutta's eighteenth birthday, on September 26, 1980, in a civil ceremony in Germany.  The following day, they were married in a Catholic Church.

Six months after they married, James Yarber was transferred to Fort Bragg, North Carolina.  The Yarbers' son, David Lee Yarber, was born in the Fort Bragg Hospital on May 18, 1981.  Ms. Yarber testified that Deborah and Robert Yarber, James Yarber's children from his first marriage, stayed with them that summer.   Deborah and Robert were living at the time in California with their mother, Jennifer.

Jutta Yarber recalled how the family transferred to Fort Sill Oklahoma after the summer of 1981.  Jutta explained that James was in the 82nd Airborne, an airborne infantry unit, requiring him to parachute from a plane every 30 days.  Ms. Yarber testified that her husband previously suffered a back injury he sustained in Vietnam was exacerbated every time he parachuted.  As a result, James Yarber requested and received a transfer to Fort Sill, Oklahoma.

5

In Fort Sill, the Yarbers bought a three-bedroom house. She recalled meeting one of her friends from Germany, whose husband was also based at Fort Sill and the two couples frequently met for barbeques and other social events. She enjoyed life at Fort Sill.

In August 1983, James's commanding officer called a meeting of members of his unit and their families to announce an upcoming deployment to Beirut, Lebanon. A few days later, on August 4, 1983, James received a telephone call directing him to report for duty. Jutta Yarber recalled James saying, "I have to go. Take me to Fort Sill." She drove him to the base "and that was the last time I saw him."

Ms. Yarber corresponded with her husband at least twice a week and she received letters from him almost daily. During her testimony, she read a letter he wrote for her 21st birthday: "My darling wife, today is your 21st birthday, the one considered by Americans to be the most important one, and I can't be with you to help you celebrate it. I am truly sorry. If it's any consideration to you, we can celebrate it when I come home. But for now, happy birthday."

The last letter she received was dated October 20, 1983. She received it two days after his death. She did not have the opportunity to speak with her husband while he was in Beirut.

Ms. Yarber recalled receiving a telephone call on the morning of October 23, 1983 from Colonel Stipe, who was in charge of Mr. Yarber's unit. Colonel Stipe informed her that there was an explosion in the marine headquarters - a "suicide mission." She recalled Colonel Stipe explaining that the "Army was not even supposed to be in the building at the time. So, the Army men should be safe, but we really don't [sic] know until later on." As soon as Ms. Yarber hung up, she heard from her friend Gaby, whose husband was also stationed in Beirut. Gaby told Ms. Yarber to turn on the television, explaining that the news was airing a report about the bombing. Gaby invited Ms. Yarber and her son to come to her house. The women watched the news on

television all day.  Colonel Stipe called to give them updates but was unable to give them any specific information.

Ms. Yarber remembered having "a bad feeling."  She told her friend Gaby that she knew something was wrong with James.  She went home with her son David and went to bed. The next morning a car drove up to her house and Colonel Stipe, in full dress uniform, and two other men got out of their car.  Ms. Yarber recalled that as she answered the door, Colonel Stipe took her hand and she asked "he's not coming back, is he" and started to cry.  Colonel Stipe told her that James Yarber was killed.  Ms. Yarber testified that her "whole world fell apart."  Colonel Stipe and the other men came into the house to comfort her.  Ms. Yarber told them she needed to notify James' sisters and her family, but she "couldn't function. "Colonel Stipe asked for an address book and called Ms. Yarber's parents in Germany and James Yarber's sisters, Hazel and Alene.  Ms. Yarber's mother immediately flew from Germany to be with her; Hazel drove from her home in Seminole, Oklahoma.

Ms. Yarber recalled that "it was awful."  A lot of their friends and families visited, bringing food.  Ms. Yarber remembered not knowing at the time that this was an American custom.  When Hazel arrived, Ms. Yarber told her she was extremely upset and that but for her son, she didn't "want to live anymore."   She told Hazel that she did not intend to harm herself, she was just "very, very upset."

Ms. Yarber testified, "I don't even know how I survived.  It was just absolutely awful. All of these strange people in my house and trying to help and reporters calling."  Hazel did most of the talking for her.

James Yarber's funeral was held on November 4, 1983; he was buried at Fort Sill.  Ms. Yarber testified that she entered and left the funeral service through the back door in order to

7

avoid reporters. She recalled how difficult it was because all of the other men that survived came back the day before Thanksgiving and James's birthday was the following day – November 24. He would have been 38.

Ms. Yarber flew with David to Germany shortly before Christmas to be with her family. She and David returned to Lawton, Oklahoma at the end of January 1984. They resided in Lawton until 1991, when they moved to Florida. Ms. Yarber survived on social security and veterans' benefits until she took a job at Dillard's department store.

Ms. Yarber testified that she does not believe her son has any memories of his father. She tried to be a "mom and dad at the same time" for David. She coached baseball and soccer. "Sometimes he did ask, you know, 'Mommy, how come I don't have a daddy,'" she testified, and "it was difficult." She felt that David needed a male role model. When Ms. Yarber's brothers came to visit, David would cling to them.

Ms. Yarber testified that she and David often talk about his father. She still has pictures of James displayed in her house and David has a copy of their wedding picture. Ms. Yarber still misses James very much. She feels that her "life could have been so different." She testified that her life after James' death has been a struggle.

**Deborah Lynn Yarber, James Yarber's Daughter**

Deborah Yarber is James Yarber's daughter with his first wife, Jennifer Brewer. She currently lives in Longview, Texas. Deborah was born on April 9, 1970 at Travis Air Force Base in California. She has a younger brother, Robert Yarber. Her parents divorced when she was 8 years old. Deborah testified that the family frequently moved because her father was in the Army. When her parents divorced, she was living in Sacramento, California, with her mother.

Deborah Yarber lived with her mother until she was 11. During that time, James Yarber

8

was stationed in Germany.  She recalled that the two exchanged letters and talked on the telephone "once in awhile."  Deborah Yarber testified that when her father returned to Fort Bragg, North Carolina, she and her brother went to visit him during the summer of 1981.  At the end of that summer, Robert returned to California to continue living with their mother.  Deborah chose to stay with Jutta and James until James' death in October 1983.

Deborah Yarber testified that she had a close relationship with her father.  She recalled while deployed to Beirut, James wrote letters to her stepmother, Jutta in which he included letters to Deborah.

Deborah Yarber recalled hearing news of the bombing on television on October 23, 1983.  Her stepmother was notified and the next day; the Chaplain and MPS came to the house; Deborah "just knew."  Deborah testified that the family was distraught.  She remembers her father's family coming to the house and staying with them through the funeral.  Deborah's mother "made sure that we came home [to Sacramento] as soon as the family business was handled."

Deborah testified that the loss of her father deeply affected her.  She has suffered from depression and some anger problems.

**Robert Wayne Yarber, James Yarber's Son**

Robert Yarber testified that he was born on July 7, 1971 in Fairfield at Travis Air Force Base.  Robert Yarber is the son of James Yarber and Jennifer Brewer.  Robert Yarber was 12 when his father died.

Robert Yarber testified that his mother and father divorced when he was seven.  He recalls being close to his father.  Prior to his parents' divorce, Robert Yarber testified that when his father finished work, the two of them would sit together and watch television.  Robert spent

9

the summer of 1981 at his father's house.  They spent a considerable amount of time together fishing, going to movies and playing board games.

Robert Yarber testified about the day he found out his father died.  He recalled that his mother picked him up from school and they drove to his aunt's house.  His aunt came out of the house and spoke privately to his mother.  He remained in the car until his mother came to take him in the house.  Once inside, "there was a lady and a gentleman from the Air Force that let me know that [James Yarber] was missing, presumed dead."  A few days later, his father's death was confirmed.

Robert testified that he traveled from California to Oklahoma to attend the funeral.  He spent a lot of time alone "because I cried quite a bit and it pained people to look at me.  So I felt very uncomfortable around it, so I isolated myself."  He recalled crying a lot at the funeral.  He remembers the 21-gun salute and "that's when it really hit me that I would never see my Dad again."  Mr. Yarber stayed in Oklahoma for about a week and then he and his sister returned to California.

He recalled that it was an "extremely difficult" time.  He "pretty much just tried to keep to myself, you know, not talking to anyone because it really hurt to talk about it."  He avoided people at school because he was uncomfortable being known as the kid that just lost his father.

Mr. Yarber attended a few grief-counseling sessions soon after the funeral.  In 2002, he was diagnosed with major depression and received counseling.  Robert Yarber testified that the earliest stages of his depression emerged after his father's death.  Prior to his father's death, he had "decent grades," "played little league," "played with friends."  After his father's death, he "withdrew," "dropped out of school, became homeless many, many times."  He testified that "it was difficult for me to hold a job down."  He was ultimately hospitalized for depression after

9/11.  He ended his deposition testimony by saying "I really wish I had time and words to explain how deeply this has affected my life growing up without a father."

**Alene Masterson, James Yarber's Sister**

Alene Masterson was born on August 24, 1938 in Nogo, Arkansas.  Her parents were Lee Payton Yarber and Eva Mae Ford Yarber.  She testified that she has a brother, Clifford Franklin Yarber and a sister, Hazel Renton.  Another sibling, Pauline, died in 1997.  She also testified that James Yarber had five half-siblings, all of whom are deceased.

Ms. Masterson testified that the Yarber family lived in Arkansas, moved to Jacksonville, Florida, back to Arkansas and then to Missouri.  She testified that the Yarber family was close.  The siblings had a lot of friends.  She remembered that James was always mechanically inclined and neighbors would come to him for help with their cars even when he was ten or eleven years old.

Ms. Masterson learned that James enlisted from her mother.  She exchanged letters with James while he was in the military and visited him when he was stationed in Malibu, California and Joliet, Illinois.  When James returned from Germany, Ms. Masterson and her daughter went to visit him and his wife, Jutta, for about a week.  She later saw James and his family when he was transferred to Fort Sill, Oklahoma.  The family drove through Kennett, Missouri, where Ms. Masterson lived and stayed with her for about a week.  Ms. Masterson testified that James Yarber wrote to her from Beirut and told her about his deployment.

Ms. Masterson recalled that, on the morning of October 23, 1983, she was at her job as a housecleaner when her brother, Cliff and his wife came to the house and told her that James was dead.  She testified that learning about his death was "really, really hard."  She remembers crying a lot and then talking to her sisters and Jutta.  They found out details of the funeral arrangement

11

and all traveled to Fort Sill.  She recalled that the funeral was a difficult experience for the entire family.

She still thinks about the bombing especially on its anniversary or when she hears about similar events happening elsewhere.

**Hazel Renton, James Yarber's Sister**

Hazel Renton grew up in Kennett, Missouri and recalls a close relationship with her siblings, "we had our squabbles, but then we would always take up for one another."  Ms. Renton testified that she loved and looked up to her brother James.  She was about twelve years old when James enlisted and she received letters from him that he would attach to those he wrote to their mother.

Ms. Renton will "never forget" October 23, 1983.  She was living in Seminole, Oklahoma and was watching the Sunday morning news when newsflash aired about the barracks in Beirut being blown up.  She recalled being "shocked" and "couldn't even move."  Ms. Renton testified that after she composed herself, she called Jutta to ask if she saw it.  Jutta told her that she had not seen the news, but "would call somebody and find out about it" and call her back.  Ms. Renton recounted how Jutta thought James may not have been in the building that was destroyed because it was the Marine barracks and he was not living there.  Shortly afterwards, Jutta called Ms. Renton, "crying, said yeah, it was Jim, and then, of course, we were both crying."

Ms. Renton and her siblings Alene, Pauline, Clifford and George traveled to Lawton, Oklahoma to attend the funeral.  The services were held at a military chapel in Fort Sill. Ms. Renton testified that "it was the worst day of my life."  She explained that Jutta did not hold up very well during that period.  All of the siblings were devastated.  Ms. Renton testified that the

12

October 23 bombing still affects her and her siblings.  The war in Iraq, the bombing in Oklahoma and the attacks on September 11 reminds her of what happened to James.  She testified, "just that losing my brother, it wasn't like he was killed in an accident or something like that, but he was brutally murdered, and I seen it right on TV, you know."  Ms. Renton stated, "it's a nightmare and it never leaves you."

**Clifford Yarber, James Yarber's Brother**

Clifford Yarber was born in Jacksonville, Florida on November 2, 1942.  His parents were Lee and May Yarber.  He testified that he had four siblings:  Alene Masterson, Pauline Yarber, Hazel Renton and James Yarber.  His father was married three times and Clifford has four half-siblings from those marriages:  George, Helen, Pat and Hershel.  All of his half-siblings are deceased.

Clifford testified that the Yarber siblings got along well.  He remembered that James was always "cutting up and telling jokes, you know, and making the day . . . He was just a likeable person."  Clifford recalled that he and James exchanged letters after James enlisted.  When James was on leave, he would return home and visit the family.  After James returned from Germany, he, Jutta and their son David visited Clifford in Kennett, Missouri.  Clifford recalled that he learned about James's deployment to Beirut only after James arrived there.

On October 23, 1983, Clifford was at work when he received a telephone call from his sister Alene, who told him that James was among the casualties of the Beirut bombing.  He was devastated by the news.  He recalled leaving work and going to Alene's house to spend the day with her.  Everyone at the funeral was very emotional.

Clifford Yarber testified that he thinks about his brother almost every day.  "He was a good brother.  It was really a shame that, you know, something had to happen like that."

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." Hill v. Republic of Iraq, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (citation omitted). To demonstrate future damages, it is incumbent upon claimants to satisfy their claim by a preponderance of the evidence and prove the amount of damages by a reasonable estimate. Id. For past economic losses, they need only "reasonably prove" the amount of damages they request mindful that the Special Master will consider any "special problems of proof arising from the defendant's absence." Id.

Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master considers whether the following types of compensatory damages are available: pain and suffering, economic losses and solatium.

### a. Pain and Suffering

Here, there is no testimony or evidence indicating that Mr. Yarber's death was anything but instantaneous. Unlike the evidence in Eisenfeld, et al. v. Islamic Republic of Iran, 172 F.Supp.2d 1 (D.D.C. 2000), where the Court awarded compensatory damages of $1,000,000 each for "several minutes" of pain and suffering of two decedents who died at the scene of the same bombing); or Flatow v. Islamic Republic of Iran, 999 F.Supp. 1 (D.D.C. 1998) ($1,000,000 for 3 to 5 hours of pain and suffering); or Elahi v. Islamic Republic of Iran, 124 F.Supp.2d 97 (D.D.C. 2000) ($1,000,000 for 3 or 4 minutes of pain and suffering), there are no affidavits, testimony or medical documentation suggesting that Mr. Yarber suffered prior to dying. Absent such evidence, the Special Master is constrained to follow the law, holding that "'[i]f death was

instantaneous there can be no recovery under such a statute for pain and suffering'" <u>Elahi v. Islamic Republic of Iran</u>, 124 F. Supp. 2d 97, 112 (D.D.C. 2000) (citation omitted).

### b. Economic Losses

28 U.S.C. § 1605A, like its predecessor 28 U.S.C. § 1605(a)(7), establishes a cause of action for wrongful death proximately caused by an act of state-sponsored terrorism. It is "designed to compensate decedent's heirs-at-law for economic losses which result from decedent's premature death." <u>Flatow</u>, 999 F.Supp. 1 at 27. In this instance, claimant put forward, in support of her demand for economic losses, a detailed report by Dr. Jerome Paige, an acknowledged expert in the field of forensic economics. Dr. Paige's detailed calculation – adjusted for inflation, rise in productivity, job advancement and personal consumption – factors in the possibilities that James Yarber may have remained in the army or that he may have pursued a civilian career. Given the testimony of Mr. Yarber's family, the Special Master believes it more likely than not that Mr. Yarber would have remained in the military. The Special Master thus finds, as a matter of law, that the appropriate monetary compensation for James Glenn Yarber's lost earnings, after discounted to present value, to be $1,046,775.

### c. Solatium

Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. 28 U.S.C. §1605A(c)(4). See also <u>Flatow</u>, 999 F.Supp. at 29; <u>Surette v. Islamic Republic of Iran</u>, 231 F.Supp.2d 260, 269-70 (D.D.C.2002). Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror [.]" <u>Stethem v. Islamic Republic of Iran</u>, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

Unlike a claim for lost wages, the amount to be awarded for the loss of solatium "cannot be defined through models and variable." Flatow, 999 F.Supp. at 32. As such, courts in this jurisdiction look to previous solatium awards for guidance. See Jenco, 154 F.Supp.2d at 38. See also Amended Administrative Plan Governing Appointed Special Masters (directing that the Special Masters be "guided" in their decisions by the Flatow, Eisenfield and Jenco decisions).

A review of prior decisions reveals awards between $8 million and $12 million for pain and suffering resulting from the death of a spouse; approximately $5 million to parents; approximately $2.5 million to siblings; and approximately $3 million to the children of the deceased. See, e.g., Belkin v. Islamic Republic of Iran, 2009 WL 3112701*12 (D.D.C. September 30, 2009) (awarding $10 million to husband of victim of suicide bombing who viewed wife's severely disabled body); Greenbaum v. Islamic Republic of Iran, 451 F.Supp.2d, 90, 108 (D.D.C. 2006) (awarding $9 million to husband of victim of terrorist attack); Higgins v. Islamic Republic of Iran, 2000 WL 33674311 *2-3 (D.D.C. September 21, 2000) (awarding $12,000,000 to wife and daughter of an Army colonel held hostage and tortured by Hizballah for 529 days before being executed); Weinstein v. Islamic Republic of Iran, 184 F.Supp.2d 13, 22 (D.D.C. 2002) (awarding $8,000,000 to wife of victim injured in terrorist bombing in Israel who suffered for 49 days with excruciating burn and blast injuries before succumbing to them); Eisenfeld,172 F.Supp.2d at 8 (awarding $5 million each to the parents and $2.5 million each to the siblings of victims of a suicide bombing on a passenger bus); Flatow, 999 F.Supp. at 31 (awarding parents each $5 million and siblings each $2.5 million of a victim who was killed in a passenger bus bombing); and Stern v. Islamic Republic of Iran, 271 F.Supp.2d 286, 301 (D.D.C. 2003) (awarding $3 million each to the children of a victim of a suicide bomber).

These are not artificial caps but guidelines designed to promote uniformity in an area not readily receptive to quantification. Considering that an award is designed to offset the profound psychological ramifications of experiencing the traumatic loss of a loved one, no bright-line rule can take account of the variety of evidence and context presented by these types of cases. The Special Master thus makes no attempt to solve this problem here in the abstract aside from utilizing those factors that have informed the courts' decisions in similar cases and hopefully advance the clarity of this particular corner. On that score, the Special Master is mindful that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award," Brewer v. Islamic Republic of Iran, --- F.Supp.2d ----, 2009 WL 3300482 *11 (D.D.C. October 15, 2009), and that awarding greater amounts may be proper in cases "with aggravating circumstances." Greenbaum v. Islamic Republic of Iran, 451 F.Supp.2d 90, 108 (D.D.C. 2006). Several indicators which may support such an enhancement include: "Testimony which describes a general feeling of permanent loss or change caused by decedent's absence" or "[m]edical treatment for depression and related affective disorders." Id. at 31. Conversely, a downward departure may be provident where the relationship between the claimant and the deceased is more attenuated. See, e.g., Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F.Supp.2d 217, 236 (S.D.N.Y. 2003).

Here, no evidence has been put forward urging a deviation in either direction. As noted above, James Yarber's wife, three siblings, and two children from a former marriage, have brought a claim for solatium damages. Their testimony, as a matter of law, is sufficient to sustain a claim for solatium. Flatow 999F.Supp. 1 at 30 (citation omitted).

Their testimony clearly establishes that James Yarber engendered a great amount of love, affection and care from his family, whose loss was substantial. The testimony compellingly

17

evidenced a close familial relationship. That said, the Special Master finds no evidence in the record suggesting any "aggravating circumstances" which would warrant an enhanced award. The Special Master finds, as a matter of law, that the following amounts are appropriate monetary compensation for this element of damages: $8,000,000 (Eight Million Dollars) for Jutta Yarber; $3,000,000 (Three Million Dollars) for Deborah Yarber; $3,000,000 (Three Million Dollars) for Robert Yarber; $2,500,000 (Two Million Five Hundred Thousand Dollars) for Alene Masterson; $2,500,000 (Two Million Five Hundred Thousand Dollars) for Hazel Renton; and $2,500,000 (Two Million Five Hundred Thousand Dollars) for Clifford Yarber.

Dated:  December 2, 2009                     Respectfully submitted,

/s/Alan L. Balaran
Alan L. Balaran, Esq.
Special Master