**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                        |     |                              |
| -------------------------------------- | --- | ---------------------------- |
| TERANCE J. VALORE, et al.,             | )   |                              |
|                                        | )   | Consolidated Actions:        |
|         Plaintiffs,                    | )   |         03-cv-1959 (RCL)     |
|                                        | )   |         06-cv-516 (RCL)      |
|         v.                             | )   |         06-cv-750 (RCL)      |
|                                        | )   |         08-cv-1273 (RCL)     |
| ISLAMIC REPUBLIC OF IRAN, et al.,      | )   |                              |
|                                        | )   |                              |
|         Defendants.                    | )   |                              |
|                                        | )   |                              |

**MEMORANDUM OPINION**

I.      **Introduction.**

This memorandum opinion accompanies the final judgments in the recently consolidated

cases of *Valore v. Islamic Republic of Iran*, No. 03-cv-1959, *Arnold v. Islamic Republic of Iran*,

No. 06-cv-516, *Spencer v. Islamic Republic of Iran*, No. 06-cv-750, and *Bonk v. Islamic

Republic of Iran*, No. 08-cv-1273.  These cases all arise out of the October 23, 1983, bombing of

the United States Marine barracks in Beirut Lebanon ("the Beirut bombing"), where a suicide

bomber murdered 241 American military servicemen in the most deadly state-sponsored terrorist

attack upon Americans until the tragic attacks on September 11, 2001.

The Court will first discuss the complicated background of these cases: the relationship

between these cases and the previously decided consolidated cases of *Peterson v. Islamic

Republic of Iran* and *Boulos v. Islamic Republic of Iran* (collectively, "*Peterson*"), recent

changes made to the Foreign Sovereign Immunities Act (FSIA), the procedural approach by

which recently amended FSIA provisions apply, the judicial notice taken of findings and

conclusions made in *Peterson* and the subsequent entry of default judgments in each case, and a

summary of the claims made in each case.   Second, the Court will make findings of fact for

these consolidated cases.  Third, the Court will discuss, relative to each previously separate case, the Court's personal and subject-matter jurisdiction.  Fourth, the Court will discuss defendants' liability under both the federal cause of action created by the Foreign Sovereign Immunities Act and causes of action under District of Columbia law.  Finally, the Court will award compensatory and punitive damages as appropriate.

## II.    Background.

### A.    Relationship to *Peterson*, Recent Changes to the FSIA, and Plaintiffs' Procedural Approach.

All plaintiffs in these consolidated cases originally brought their individual actions against defendants under 28 U.S.C. § 1605(a)(7), the former state-sponsor-of-terrorism exception to the general rule of sovereign immunity enumerated in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611.  Section 1605(a)(7) "was 'merely a jurisdiction conferring provision,' and therefore did not create an independent federal cause of action against a foreign state or its agents."  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31 (D.D.C. 2009) (quoting *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027, 1032 (D.C. Cir. 2007)) (Lamberth, J.).  It merely opened the door to plaintiffs seeking to bring suit in federal court against foreign sovereigns for terrorism-related claims, which had to be based on state tort law.  *See id.* at 40–48 (providing a historical overview of the FSIA terrorism exception) Further, the FSIA did not permit the awarding of punitive damages against foreign states themselves.  *Id.* at 48.

These cases come to the Court following final judgment in *Peterson*.  *See* 264 F. Supp. 2d 46 (D.D.C. 2003) (Lamberth, J.) [hereinafter *Peterson I*].  That case established the liability of Iran and MOIS in the terrorist attack out of which these cases also arise, but did so under § 1605(a)(7), thus reaching "inconsistent and varied result[s]" when various states' tort laws

differed. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 59; *see Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (Lamberth, J.) [hereinafter *Peterson II*]. Congress responded to this inconsistency and the unavailability of punitive damages by replacing § 1605(a)(7) with § 1605A, a new terrorism exception that provides an independent federal cause of action and makes punitive damages available to plaintiffs. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 58–61 (discussing repeal of § 1605(a)(7) and enactment of § 1605A). Plaintiffs now seek to take advantage of these changes.

Individuals seeking to take advantage of this new cause of action and punitive-damages allowance must proceed under one of three procedural approaches, which are laid out in part in the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083(2)–(3), 112 Stat. 3, 342–43. *See generally In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 62–65 (discussing retroactive application of § 1605A to cases previously filed under § 1605(a)(7)). First, potential plaintiffs may pursue a case related to a "prior action":

> With respect to any action that was brought under section 1605(a)(7) of title 28, United States Code . . . before [Jan. 28, 2008,] relied upon . . . such provision as creating a cause of action, has been adversely affected on the grounds that [such] provision[] fail[ed] to create a cause of action against the state, and as of such date . . . is before the courts in any form . . . , that action, and any judgment in the action[,] shall . . . be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code.

§ 1083(c)(2)(A). Second and alternatively, potential plaintiffs may pursue a case related to a "related action":

> If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, . . . any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code . . . .

§ 1083(c)(3).  Third and finally, potential plaintiffs may pursue a stand-alone action, i.e., one not related to any action previously filed under § 1605(a)(7), such that retroactive application of § 1605A is not necessary.

Plaintiffs in these cases all proceed under the second approach.  Actions timely commenced under § 1605(a)(7) in this Court that relate to the Beirut bombing include *Peterson v. Islamic Republic of Iran*, No. 01-cv-2094; *Boulos v. Islamic Republic of Iran*, No. 01-cv-2684; *Valore v. Islamic Republic of Iran*, No. 03-cv-1959; *Bland v. Islamic Republic of Iran*, No. 05-cv-2124; *Arnold v. Islamic Republic of Iran*, No. 06-cv-516; *Murphy v. Islamic Republic of Iran*, No. 06-cv-596; *O'Brien v. Islamic Republic of Iran*, No. 06-cv-690; *Spencer v. Islamic Republic of Iran*, No. 06-cv-750; and *Davis v. Islamic Republic of Iran*, No. 07-cv-1302.  The consolidated cases before the Court today, therefore, are related to several related cases.  By the plain terms of § 1083(c)(3), the plaintiffs in these consolidated cases may therefore proceed under § 1605A.

**B.**     **Default Judgment and Judicial Notice of Findings of Fact and Conclusions of Law from *Peterson*.**

In each of the cases now consolidated, this Court took judicial notice of the findings of fact and conclusions of law made in *Peterson*.  In the orders taking such notice, the Court also issued default judgments against both defendants.  Plaintiffs had established their right to relief "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), through "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence," *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001) (quotation omitted).

A court may take judicial notice of any fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned."  FED. R. EVID. 201(b).  Under Rule 201(b), courts generally may take judicial notice of court records.  *See* 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5106.4; *see also Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . .").  Indeed, as has been noted in several other FSIA cases brought in this District, "this Court 'may take judicial notice of related proceedings and records in cases before the same court.'"  *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009) (quoting *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d. 229, 267 (D.D.C. 2006) (Lamberth, J.) [hereinafter *Heiser I*]).  At issue is the effect of such notice.

Although a court clearly may judicially notice its findings of facts and conclusions of law in related cases, this Circuit has not directly considered whether and under what circumstances a court may judicially notice the *truth* of such findings and conclusions.  Circuits that have addressed this question have concluded that "courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these are disputable and usually are disputed"; but because "it is conceivable that a finding of fact may satisfy the indisputability requirement," these courts have not adopted a per se rule against such notice.  *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829–30 (5th Cir. 1998); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F. 3d 66, 70 (2d Cir. 1998); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *Holloway v. Lockhart*, 813 F.2d 874, 878–79 (8th Cir. 1987).  *See generally* 21B WRIGHT & GRAHAM, *supra*, § 5106.4 ("While judicial findings of fact may be more reliable than other facts found in the file, this does not make them indisputable[.]").

This District has followed a similar approach in FSIA cases: judicial notice of truth of findings and conclusions is not prohibited per se, but is inappropriate absent some particular indicia of indisputability. Here, there are no such indicia. With "defendants having failed to enter an appearance," *Peterson* was decided without the full benefits of adversarial litigation, and its findings thus lack the absolute certainty with which they might otherwise be afforded. *Peterson I*, 264 F. Supp. 2d at 49. Just as "findings of fact made during this type of one-sided hearing should not be given a preclusive effect," *Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) (Lamberth, J.), they also should not be assumed true beyond reasonable dispute. Moreover, because "default judgments under the FSIA require additional findings than in the case of ordinary default judgments," *id.* at 19–20, the court should endeavor to make such additional findings in each case.

The taking of judicial notice of the *Peterson* opinion, therefore, does not conclusively establish the facts found in *Peterson* for, or the liability of the defendants in, these consolidated cases. But "the FSIA does not require this Court to relitigate issues that have already been settled" in previous decisions. *Brewer*, 664 F. Supp. 2d at 54. Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence. *Heiser I*, 466 F. Supp. 2d at 264 (reconsidering evidence presented in *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (2006) (Lamberth, J.)). In rendering default judgment against defendants, the Court was therefore required to, and did, find facts and make legal conclusions anew. Below, the Court expounds on those findings and conclusions.

### C. Summary of Plaintiffs' Claims.

In these consolidated cases, plaintiffs bring several types of claims, some under the FSIA-created cause of action and some under District of Columbia law. Under the FSIA,

servicemen who survived the attack have brought claims of assault, battery, and intentional infliction of emotional distress, seeking damages for pain and suffering and economic losses;[1] the estates of servicemen killed in the attack ("decedents") have brought survival claims, seeking economic damages for pain and suffering by decedents before death;[2] estates of decedents have brought claims for wrongful death, seeking to recover for decedents' lost wages and earnings they would have earned but for their deaths;[3] and family members of victims have brought claims for intentional infliction of emotional distress, seeking solatium.[4]  Under District of

---

[1] These plaintiffs are: from *Valore*, Dennis Jack Anderson, Pedro Alvarado, Jr., Timothy Brooks, Floyd Carpenter, Michael Harris, Donald R. Pontillo, John E. Selbe, Willy G. Thompson, and Terance J. Valore; and from *Arnold*, Neale Scott Bolen.  There are no such plaintiffs in *Spencer* or *Bonk*.

[2] These plaintiffs are: from *Arnold*, Estate of Moses Arnold, Jr.; and from *Spencer*, Estate of James Silvia.  There are no such plaintiffs in *Valore* or *Bonk*.

Although plaintiffs in *Spencer* plead their survival claim under state law and have not amended their complaint to allege such claim under the FSIA-created cause of action, they received leave of Court to proceed under § 1605A without amending their complaint.  *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 97 (D.D.C. 2009) (Lamberth, C.J.).  The Court therefore construes the complaint to bring this survival claim under the FSIA-created cause of action.

[3] These plaintiffs are: from *Arnold*, Estate of Moses Arnold, Jr.; and from *Spencer*, Estate of James Silva.  There are no such plaintiffs in *Valore* or *Bonk*.  As noted *supra* note 2, the Court construes plaintiffs' claim in *Spencer* as brought under the FSIA-created cause of action.

[4] These plaintiffs are: from *Valore*, Estate of David L. Battle, Estate of Matilde Hernandez, Jr., Estate of John Muffler, Estate of John Jay Tishmack, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Estate of James Yarber, Angel Alvarado, Andres Alvarado Tull, Geraldo Alvarado, Grisselle Alvarado, Luis Alvarado, Luisa Alvarado, Maria Alvarado, Marta Alvarado, Minerva Alvarado, Yolanda Alvarado, Zoraida Alvarado, Cheryl Bass, Edward J. Brooks, Patricia A. Brooks, Wanda Ford, Bennie Harris, Rose Harris, Marcy Lynn Parson, Douglas Pontillo, Leonora Pontillo, Eloise F. Selbe, Don Selbe, James Selbe, Belinda Skarka, Allison Thompson, Isaline Thompson, Johnny Thompson, Deborah True, Janice Valore, Orlando M. Valore, Jr., and Orlando Michael Valore, Sr.; from *Arnold*, Lolita M. Arnold, Estate of Moses Arnold, Jr., Lisa Ann Beck, Betty J. Bolen, Keith Edwin Bolen, Sheldon H. Bolen, and Sharla M. Korz; from *Spencer*, Lynne Michol Spencer; and from *Bonk*, Catherine Bonk, Kevin Bonk, Thomas Bonk, John Bonk, Sr., Danielle DiGiovanni, Lisa DiGiovanni, Marion DiGiovanni, Robert DiGiovanni, Sherry Lynn Fiedler, Robert Fluegel, Thomas A. Fluegel, Marilou Fluegel, Evans Hairston, Felicia Hairston,

Columbia law, estates of decedents have brought survival claims, seeking economic damages for pain and suffering by decedents before death;[5] and estates of decedents have brought wrongful-death claims, seeking to recover for decedents' lost wages and earnings they would have earned but for their deaths.[6] Finally, all plaintiffs have sought punitive damages now available under the FSIA.

---

Julia Bell Hairston, Henry Durban Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Melissa Hukill, Meredith Ann Hukill, Mitchell Charles Hukill, Monte Hukill, Virginia Ellen Hukill, Catherine Bonk Hunt, Storm Jones, Penni Joyce, Jeff Kirkwood, Shirley Kirkwood, Carl Arnold Kirkwood, Jr., Carl Kirkwood, Sr., Patricia Kronenbitter, Kris Laise, Bill Laise, Betty Laise, James Macroglou, Lorraine Macroglou, Bill Macroglou, Kathy McDonald, Edward W. McDonough, Sean McDonough, Edward Joseph McDonough, Deborah Spencer Rhosto, Estate of Rose Rotondo, Estate of Luis Rotondo, Estate of Phyllis Santoserre, Robert Simpson, Renee Eileen Simpson, Anna Marie Simpson, Larry H. Simpson, Sr., and Sally Jo Wirick.

   Although plaintiffs in *Bonk* pled that they are "legally entitled to assert a claim under the District of Columbia Wrongful Death Act [and] the District of Columbia Survival Act," (*Bonk* Compl. ¶ 1), they do not make any claims under either Act. The Court notes that such claims have already successfully been made in *Peterson* by estates of which these plaintiffs are beneficiaries. *See Peterson II*,. 515 F. Supp. 2d at 38–39. The Court therefore has not considered any potential claim under either Act in *Bonk*.

   [5] These plaintiffs are: from *Valore*, Estate of David L. Battle, Estate Of Matilde Hernandez, Jr., Estate of John Muffler, Estate of John Jay Tishmack, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., and Estate of James Yarber. There are no such plaintiffs in *Arnold*, *Spencer*, or *Bonk*.

   Although plaintiffs in *Valore* amended their complaint to bring some claims under the FSIA-created cause of action, they continue to press their survival claims under District of Columbia law. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 100 (noting that the amended "complaint is very similar to the original complaint in the sense that it continues to rely on District Columbia law for . . . survivorship claims.").

   [6] These plaintiffs are: from *Valore*, Estate of David L. Battle, Estate Of Matilde Hernandez, Jr., Estate of John Muffler, Estate of John Jay Tishmack, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., and Estate of James Yarber. There are no such plaintiffs in *Arnold*, *Spencer*, or *Bonk*.

   Although plaintiffs in *Valore* amended their complaint to bring some claims under the FSIA-created cause of action, they continue to press their wrongful-death claims under District of Columbia law. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 100

**III.     Facts.**

Based on plaintiffs' uncontroverted factual assertions in their complaints and with due

reference to facts found in *Peterson*, the Court finds the following:

**A.     The Relationship Between Hezbollah and Iran.**

In late 1982 [during the Lebanese Civil War], with the concurrence of the
United Nations, a multinational peacekeeping coalition consisting of American,
British, French, and Italian soldiers arrived in the Lebanese capital of Beirut.  In
May of 1983, the 24th Marine Amphibious Unit of the U.S. Marines ("the 24th
MAU") joined this coalition.
. . . .
Following the 1979 revolution spearheaded by the Ayatollah Ruhollah
Khomeini, the nation of Iran was transformed into an Islamic theocracy. . . . The
post-revolutionary government in Iran . . . declared its commitment to spread the
goals of the 1979 revolution to other nations.  Towards that end, between 1983
and 1988, the government of Iran spent approximately $50 to $150 million
financing terrorist organizations in the Near East.  One of the nations to which the
Iranian government directed its attention was the war-torn republic of Lebanon.

"Hezbollah" is an Arabic word meaning "the party of God."  It is also the
name of a group of Shi'ite Muslims in Lebanon that was formed under the
auspices of the government of Iran.  Hezbollah began its existence as a faction
within a group of moderate Lebanese Shi'ites known as Amal.  Following the
1982 Israeli invasion of Lebanon, the Iranian government sought to radicalize the
Lebanese Shi'ite community, and encouraged Hezbollah to split from Amal.
Having established the existence of Hezbollah as a separate entity, the
government of Iran framed the primary objective of Hezbollah: to engage in
terrorist activities in furtherance of the transformation of Lebanon into an Islamic
theocracy modeled after Iran.

*Peterson I*, 264 F. Supp. 2d at 49–51 (footnotes omitted).

During the *Peterson* trial, several experts testified on Iran's terrorist activities.  Patrick

Clawson, Ph.D., "a widely-renowned expert on Iranian affairs," testified that in 1983, Hezbollah

was "a creature of the Iranian government."  *Id.* at 51.  According to Dr. Clawson:

Both from the accounts of Hezbollah members and from the accounts of the
Iranians and of every academic study that I'm aware of, certainly at this time,

_____

(noting that the amended "complaint is very similar to the original complaint in the sense that it
continues to rely on District Columbia law for wrongful[-]death . . . claims.").

> Hezbollah is largely under Iranian orders.  It's almost entirely acting . . . under the order of the Iranians and being financed almost entirely by the Iranians.

*Id.*  Dr. Clawson's testimony was corroborated by that of Michael Ledeen, Ph.D., "a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, [who] testified at trial that 'Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization.'"  *Id.* at 51 n.8.  Dr. Clawson's testimony was further corroborated by Reuven Paz, Ph.D., "who has researched Islamic groups for the last 25 years" and who testified at trial that Hezbollah "totally relied upon . . . Iranian support" and that at the time of the Beirut bombing, "when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon."  *Id.* at 52.  Dr. Paz testified further that Hezbollah could not have carried out the Beirut bombing "without Iranian training, without . . . Iranian supply of the explosives . . . , and without directions from the Iranian forces in Lebanon itself."  *Id.*

> It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran.  Hezbollah . . . receive[d] extensive financial and military technical support from Iran, which funds and supports terrorist activities.  The primary agency through which the Iranian government both established and exercised operational control over Hezbollah was the Iranian Ministry of Information and Security ("MOIS").  MOIS had formerly served as the secret police of the Shah of Iran prior to his overthrow in 1979.  Despite the revolutionary government's complete break with the old regime, it did not disband MOIS, but instead allowed it to continue its operations as the intelligence organization of the new government. . . . MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives to Hezbollah and, at all times relevant to these proceedings, exercised operational control over Hezbollah.  [*See generally* COUNCIL ON FOREIGN RELATIONS, HEZBOLLAH (A.K.A. HIZBOLLAH, HIZBU'LLAH), http://www.cfr.org/publication/9155 (2009) [hereinafter HEZBOLLAH] ("[Hezbollah] has close links to Iran . . . ."); COUNCIL ON FOREIGN RELATIONS, STATE SPONSORS: IRAN, http://www.cfr.org/publication/9362 (2007) ("Iran mostly backs Islamist groups, including the Lebanese Shiite militants of Hezbollah . . . .").]

> It is clear that MOIS was no rogue agency acting outside of the control and authority of the Iranian government. . . . [T]he October 23 attack would have

been impossible without the express approval of Iranian government leaders at the highest level[.]

The approval of the ayatollah and the prime minister was absolutely necessary to carry out the continuing economic commitment of Iran to Hezbollah, and to execute the October 23 attack. Given their positions of authority, any act of these two officials must be deemed an act of the government of Iran.

*Id.* at 52–53. As Dr. Clawson testified, approval for the attack could only come after "a discussion in the National Security Council which would involve the prime minister, and it would also have required the approval of Iran's supreme religious leader, Ayatollah Khomeini." *Id.* at 53; *see also* ANTHONY H. CORDESMAN & MARTIN KLEIBER, CTR. FOR STRATEGIC & INT'L STUDIES, IRAN'S MILITARY FORCES AND WARFIGHTING CAPABILITIES 131 (2007) (noting that MOIS is funded by Iran with "a comparatively large budget" and "operates under the broader guidance of Ali Khamenei").

### B.     The Beirut Bombing.

The complicity of Iran in the 1983 attack was established conclusively . . . [by a] message [that] had been sent from MOIS to [the] Iranian ambassador to Syria . . . . The message directed the Iranian ambassador to contact . . . the leader of the terrorist group Islamic Amal, and to instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and "to take a spectacular action against the United States Marines."
. . . .
Hezbollah members formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon.
. . . .
[A] 19-ton truck was disguised so that it would resemble a water[-] delivery truck that routinely arrived at the Beirut International Airport, which was located near the U.S. Marine barracks in Beirut, and modified the truck so that it could transport an explosive device. On the morning of October 23, 1983, members of Hezbollah ambushed the real water delivery truck before it arrived at the barracks. An observer was placed on a hill near the barracks to monitor the operation. The fake water[-]delivery truck then set out for the barracks . . . .

At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks. As the truck circled in the large parking lot behind the barracks, it increased its speed. The truck crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks. When the truck reached the center of the barracks, the bomb in the truck detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth. The force of its impact ripped locked doors from their doorjambs at the nearest building, which was 256 feet away. Trees located 370 feet away were shredded and completely exfoliated. At the traffic control tower of the Beirut International Airport, over half a mile away, all of the windows shattered. . . . The explosion created a crater in the earth over eight feet deep. The four-story Marine barracks was reduced to fifteen feet of rubble.

*Peterson I*, 264 F. Supp. 2d at 54–58 (footnotes omitted).

"As a result of the Marine barracks explosion, 241 servicemen were killed, and many others suffered severe injuries." *Id.* at 58. In the immediate aftermath of the explosion, those who could "ran to the rubble and started searching for survivors among the loose hands, heads, legs, arms, and torsos that littered the ruble-strewn ground." ERIC M. HAMMEL, THE ROOT: THE MARINES IN BEIRUT, AUGUST 1982–FEBRUARY 1984, at 330 (1985). In the remains of the barracks, "[h]uge blocks of steel-laced concrete angled in all directions" where "twisted corpses dangled from the cracks." *Id.* at 352. Many of those who survived "had shredded skin adhering to their lower legs and feet . . . caused by the force of the blast." *Id.* at 351. The Court need not expand further on the gruesome detail of this horrific attack; several historians and eyewitnesses have contributed to a rich historical record of the tragedy.[7]

---

[7] For the Marine Corps' official history of the event, see BENIS M. FRANK, U.S. MARINES IN LEBANON: 1982–1984, at 1–5, 94–105 (1987), available at http://purl.access.gpo.gov/GPO/LPS98826. For gripping first-hand accounts, see GLENN E. DOLPHIN, 24 MAU 1983: A MARINE LOOKS BACK AT THE PEACEKEEPING MISSION TO BEIRUT, LEBANON 161–90 (2005) and MICHAEL PETIT, PEACEKEEPERS AT WAR: A MARINE'S ACCOUNT OF THE BEIRUT CATASTROPHE 165–98 (1986). For an excellent combination of eyewitness accounting and historical analysis, including the role of Iran and Hezbollah in the attack and a discussion of the *Peterson* litigation, see TIMOTHY J. GERAGHTY, PEACEKEEPERS AT WAR: BEIRUT 1983—THE MARINE COMMANDER TELLS HIS STORY 91–121, 181–201 (2009).

**IV.    Jurisdiction.**

The FSIA "is the sole basis of jurisdiction over foreign states in our courts."  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 39.  The FSIA concerns both subject-matter jurisdiction and personal jurisdiction.  The Court has both.

**A.    Subject-Matter Jurisdiction.**

Several sections of the FSIA and related statutes set forth several specific requisites that must be satisfied for the Court to have jurisdiction over the subject matter of this case.  These requisites may be broken down into four categories: grant of original jurisdiction, waiver of sovereign immunity, requirement that a claim be heard, and limitations.  Plaintiffs have satisfied all subject-matter jurisdictional requisites.

**1.    Grant of Original Jurisdiction.**

The FSIA grants U.S. district courts "original jurisdiction without regard to amount in controversy of any [(1)] nonjury civil action [(2)] against a foreign state . . . [(3)] as to any claim for relief in personam [(4)] with respect to which the foreign state is not entitled to immunity." § 1330(a).  The FSIA defines a foreign state to include any "political subdivision" or "agency or instrumentality" thereof, § 1603(a), and further defines an agency or instrumentality as "any entity (1) which is a separate legal person, corporate or otherwise[,] . . . (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof[;] and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country," § 1603(b).  In interpreting and applying these statutory definitions, this Circuit employs a core-functions test, under which "an entity that is an 'integral part of a foreign state's political structure' is to be treated as the foreign state itself" while an "entity the structure and core function of which are commercial is to be treated as an 'agency or instrumentality' of the state."

*TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005)

(quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)).

First, no party has sought a jury trial, nor are they entitled to one under the Seventh

Amendment in this type of case, *Croesus EMTR Master Fund L.P. v. Federative Republic of

Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002) ("[C]laims under the FSIA are not eligible for

resolution by a jury . . . ."). Therefore, this is a nonjury civil action.

Second, plaintiffs have instituted this action against Iran and MOIS, both of which are

considered to be a foreign state. Iran, of course, is the foreign state itself. "MOIS is considered

to be a division of state of Iran, and is treated as a member of the state of Iran itself." *Bennett v.

Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (citing *Roeder v. Islamic Republic of Iran*,

333 F.3d 228, 234 (D.C. Cir. 2003); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105,

116 (D.D.C. 2005)) (Lamberth, J.). In other words, MOIS is a political subdivision of Iran.

Therefore, this action is against a foreign state as defined by the FSIA.

Third, as discussed *infra* Part IV.B, the Court has personal jurisdiction over the

defendants as legal persons, rather than property. Therefore, this is an action in personam, rather

than in rem.

Fourth and finally, as discussed *infra* Part IV.A.2., Iran and MOIS are not entitled to

immunity from this suit.

Accordingly, because this is a nonjury civil action against a foreign state for relief in

personam to which the defendants are not immune, the Court has original jurisdiction over these

cases.

### 2.     Waiver of Sovereign Immunity.

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United

States courts; unless a specified exception applies, a federal court lacks subject-matter

jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355

(1993). Because "subject-matter jurisdiction turns on the existence of an exception to foreign

sovereign immunity, . . . even if the foreign state does not enter an appearance to assert an

immunity defense, a District Court still must determine that immunity is unavailable under the

Act." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 n.20 (1983). (As discussed

*supra* Part II.B., defendants have indeed failed to enter an appearance.) Under the FSIA

terrorism exception, sovereign immunity is waived when plaintiffs allege (1) that a foreign state

(2) committed "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or

[provided] material support or resources for such an act if such act or provision of material

support or resources is engaged in by an official, employee, or agent of such foreign state while

acting within the scope of his or her office, employment, or agency," (3) which "caused" (4)

"personal injury or death" (5) for which "money damages are sought." § 1605A(1).

    First, plaintiffs have brought suit against Iran and MOIS, both of which are considered to

be a foreign state. *See* discussion *supra* Part IV.A.2.

    Second, plaintiffs, in their respective complaints, allege that defendants committed

torture, extrajudicial killing, and the provision of material support and resources therefor,

providing operational control over and financial and technical assistance to Iranian agents of

Hezbollah who constructed, deployed, and exploded the truck bomb, injuring and killing

hundreds. Plaintiffs therefore have sufficiently alleged the commission of acts of torture and

extrajudicial killing and the provision of material support and resources therefor by defendants.

    Third, concerning causation, "there is no 'but-for' causation requirement" for claims

made under the FSIA. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp 2d at 42. In

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, a case which interpreted the substantially

similar § 1605(a)(7) that is now § 1605A, this Circuit noted that in the FSIA, "the words 'but for'

simply do not appear; only 'caused by' do." 376 F.3d 1123, 1128 (D.C. Cir. 2004). Adopting

the Supreme Court's approach to a different but similarly worded jurisdictional statute, the

Circuit interpreted the causation element "to require only a showing of 'proximate cause.'" *Id.*

(citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38

(1995)). "Proximate cause exists so long as there is 'some reasonable connection between the

act or omission of the defendant and the damages which the plaintiff has suffered.'" *Brewer*, 664

F. Supp. 2d at 54 (construing causation element in § 1605A by reference to cases decided under

§ 1605(a)(7)) (quoting *Kilburn*, 376 F.3d at 1128). Here, there are several reasonable alleged

connections between the acts of defendants and the deaths of 241 servicemen and physical and

emotional injuries suffered by military servicemen and plaintiffs: plaintiffs allege that Iran's

high-level technical participation facilitated the construction and deployment of the bomb so as

to maximize its destructive effect, that defendants ordered the attack and oversaw its operation,

and that Iran financially supported Hezbollah. Plaintiffs therefore have sufficiently alleged

causation.

Fourth and fifth, plaintiffs allege several instances of personal injury and death for which

money damages have been sought. The FSIA does not restrict the personal injury or death

element to injury or death suffered directly by the claimant; instead, such injury or death must

merely be the bases of a claim for which money damages are sought. § 1605A(1). In these

cases, plaintiffs alleged, of course, the deaths of 241 servicemen and numerous other physical

injuries suffered by those who survived the attack, but also emotional and financial injury to

survivors, decedents, decedent's estates, and decedent's family members, for which plaintiffs

seek millions of dollars in money damages. Plaintiffs have therefore alleged personal injury or

death for which money damages have been sought.

Accordingly, because plaintiffs have brought suit against a foreign state for acts of torture and extrajudicial killing and the provision of material resources for the same which caused personal injury and death for which money damages have been sought, defendants are not entitled to sovereign immunity.

### 3.      Requirement That a Claim Be Heard.

A federal district court "shall hear a claim" under the FSIA terrorism exception when certain conditions are met.  § 1605A(2).  One such set of conditions applies where (1) "the foreign state was designated as a state sponsor of terrorism at the time the act" giving rise to the claim occurred "or was so designated as a result of such act," § 1605A(a)(2)(A)(i)(I), and, in a case related to a related action, "was designated as a state sponsor of terrorism when the . . . related action under section 1605(a)(7) . . . was filed," § 1605A(a)(2)(A)(i)(II)[8]; (2) "the claimant or the victim was, at the time the act" giving rise to the claim,  "a national of the United States[,] a member of the armed forces[,] or otherwise an employee of the Government of the United States[] or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment," § 1605A(a)(2)(A)(ii); and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," § 1605A(a)(2)(A)(iii). The FSIA elaborates on the first element by defining "state sponsor of terrorism" to mean "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism," § 1605A(h)(6), and the second by defining "national of the United States" to mean "a citizen of the United States[]

---

[8] This element applies only to cases related to related actions.  For different requirements for cases related to prior actions, see § 1605A(a)(2)(A)(i)(II).  For stand-alone cases, see § 1605A(a)(2)(A)(i)(I).

or . . . a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(22); § 1605A(h)(5).[9]

First, concerning designation as a state sponsor of terrorism, Iran was so designated by the Secretary of State in partial response to the Beirut bombing. U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 FED. REG. 2836, Jan. 23, 1984 (designating Iran as a state sponsor of terrorism for the first time upon concluding that "Iran is a country which has repeatedly provided support for acts of international terrorism"). Iran also remained so designated when several original actions to which these cases are related were filed. The related actions identified by the Court *supra* Part II.A. were filed in 2001, 2003, 2005, 2006, and 2007. In each year, Iran remained a designated state sponsor of terrorism. *See* U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM 2007, at 172 (2008), *available at* http://www.state.gov/documents/organization/105904.pdf (noting that "Iran remained the most active state sponsor of terrorism" in the year of the report's title); U.S. DEP'T OF STATE: COUNTRY REPORTS ON TERRORISM 2006, at 147 (2007), *available at* http://www.state.gov/documents/organization/83383.pdf (same); U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM 2005, at 173 (2006), *available at* http://www.state.gov/documents/ organization/65462.pdf (same); U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 2003, at 86 (2004), *available at* http://www.state.gov/documents/organization/31912.pdf (same); U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 2001, at 64 (2002), *available at* http://www.state.gov/documents/organization/10319.pdf (same). The requirements of § 1605A(a)(2)(A)(i) are therefore satisfied.

---

[9] For the other condition under which a court must hear a FSIA claim, but which does not apply to this case, see § 1605A(a)(2)(B).

Second, concerning claimants and victims, the Court identifies victims as those who suffered injury or died as a result of the attack and claimants as those whose claims arise out of those injuries or deaths but who might not be victims themselves. In this case, victims include the 241 members of the U.S. armed forces who were killed, the many more who were physically and emotionally injured, and the family members alleging injury suffered from intentional infliction of emotional distress, all of whom are nationals of the United States. Claimants include the same groups or the estates thereof. *See* discussion *infra* Part V.B. The requirements of § 1605A(a)(2)(A)(ii) are therefore satisfied.

Third and finally, because the Beirut bombing occurred in Lebanon, not the defendant-state, the arbitration requirements of § 1605A(a)(2)(A)(iii) do not apply.

Accordingly, because Iran was designated a state sponsor of terror by the U.S. State Department as a partial result of the Beirut bombing and remained so designated when a case related to this one was filed; all victims and claimants were or are members of the U.S. armed forces, U.S. nationals, or the estates thereof; and arbitration need not be attempted, the Court is required by the FSIA to hear plaintiffs' claims.

### 4. Limitations.

All cases brought under § 1605A—whether stand-alone or related to a related or prior action—face a 10-year limitations period. For cases related to a related action, the related action must have been "commenced under section 1605(a)(7) . . . not later than the latter of 10 years after April 24, 1996, or 10 years after the date on which the cause of action arose." § 1605A(b).[10] The related action to which *Valore*, *Arnold*, *Spencer*, and *Bonk* are most closely

---

[10] See § 1605A(b) for language applying to stand-alone cases and cases related to prior actions.

related is *Peterson*, which was commenced in 2001, well within the 10-year period after April 24, 1996.

Cases related to related or prior actions also face additional 60-day limitations periods. Cases related to related actions must commence "not later than the latter of 60 days after the date of the entry of judgment in the original action or" January 28, 2008. § 1083(c)(3).[11] *Valore* was commenced in 2003, *Arnold* and *Spencer* in 2006, and *Bonk* in 2008. Judgment was entered in *Peterson* on September 7, 2007. *See Peterson II*, 515 F. Supp. 2d 25. *Valore*, *Arnold*, and *Spencer* were all filed, therefore, well before 60 days after September 7, 2007. *Bonk* is also related to *Valore*, *Arnold*, and *Spencer*, in which final judgment is being entered today. *Bonk* was filed, therefore, well before 60 days after today.

Accordingly, because plaintiffs satisfy both the 10-year and 60-day limitations periods, Plaintiffs are not time-barred from raising their claims.

## 5. Conclusions Concerning Subject-Matter Jurisdiction.

First, these cases are nonjury civil actions against a foreign state for relief in personam to which the defendants are not immune. The Court therefore has original jurisdiction over these cases. Second, plaintiffs have brought suit against a foreign state for acts of torture and extrajudicial killing and the provision of material resources for the same which caused personal injury and death for which money damages have been sought. Defendants are therefore not entitled to sovereign immunity. Third, Iran was designated a state sponsor of terror by the U.S. State Department as a partial result of the Beirut bombing and remained so designated when cases related to this one were filed; all victims and claimants were or are members of the U.S. armed forces, U.S. nationals, or the estates thereof; and arbitration need not be attempted. The Court is therefore required to hear plaintiffs' claims. Fourth and finally, plaintiffs satisfied both

---

[11] See § 1083(c)(2)(C)(i) for language applying to cases related to prior actions.

the 10-year and 60-day limitations periods.  Plaintiffs are therefore not time-barred from bringing

suit.  The Court therefore has subject-matter jurisdiction over these cases.

**B.    Personal Jurisdiction.**

The FSIA provides specific statutory rules controlling when a federal district court shall

have personal jurisdiction over a foreign state, *see* § 1608, but ordinary minimum-contacts

requirements of the Fifth Amendment may continue to apply, depending on the form in which a

foreign state is named a defendant, *see TMR Energy*, 411 F.3d at 299–302.  Under both the

statutory rules and the minimum-contacts test, the definition of foreign state otherwise applicable

to provisions of the FSIA does not apply; Congress and the courts distinguish between a foreign

state itself and a political subdivision, agency, or instrumentality ("entities") thereof.  § 1603(a)

(defining "foreign state" for all FSIA sections except § 1608); § 1608 (setting forth statutory

distinctions between foreign states and entities thereof); *TMR Energy*, 411 F.3d at 299–302

(discussing jurisprudential distinctions between foreign states and entities thereof).  Applying

these distinctions, the Court has personal jurisdiction under the FSIA over Iran—a foreign state

itself—and MOIS—a political subdivision thereof—and the minimum-contacts test does not

apply.

**1.    FSIA-Specific Rules.**

The FSIA establishes the requirements for proper service upon a foreign
state or a political subdivision of a foreign state.  *See* Fed. R. Civ. P. 4(j)(1).  The
FSIA prescribes four methods of service, in descending order of preference.
Plaintiffs must attempt service by the first method (or determine that it is
unavailable) before proceeding to the second method, and so on.  *See* 28 U.S.C.
§ 1608(a).

The preferred method of service is delivery of the summons and complaint
"in accordance with any special arrangement for service between the plaintiff and
the foreign state." 28 U.S.C. § 1608(a)(1).  If no such arrangement exists, then
delivery is to be made "in accordance with an applicable international convention
on service of judicial documents."  *Id.* § 1608(a)(2).  If neither of the first two
methods is available, plaintiffs may send the summons, complaint, and a notice of

suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). Finally, if mailed service cannot be accomplished within thirty days, then the statute permits plaintiffs to request that the clerk of the court dispatch two copies of the summons, complaint, and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* § 1608(a)(4).

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)).[12]

In these cases, no special arrangements for service exist between Iran and the plaintiffs, nor is Iran a party to any applicable international convention on service of judicial documents. *See* U.S. Dep't of State, Bureau of Consular Affairs, Service Of Legal Documents Abroad, http://travel.state.gov/law/info/judicial/judicial_680.html (last visited March 31, 2010) (discussing international conventions on service of process); Hague Conf. on Private Int'l Law, Status Table, http://hcch.e-vision.nl/index_en.php?act=conventions.status&cid=17 (last visited March 31, 2010) (showing that Iran is not a signatory to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters). The first two methods of service are therefore inapplicable. Concerning the third method, plaintiffs in each case attempted to serve the summons, complaint, and notice of suit, translated into Farsi, the official language of Iran, to the head of the Iranian Ministry of Foreign Affairs, but to no avail; service was refused.

Plaintiffs therefore requested that the clerk dispatch two copies of the summons, complaint, and notice of suit, translated into Farsi, to the Secretary of State. The Court granted plaintiffs' requests, the clerk dispatched the documents, and the Secretary of State transmitted

---

[12] See § 1608(b) for language applying to service of agencies and instrumentalities of foreign states.

one copy of the documents to Iran via a diplomatic note though the Embassy of the Swiss Confederation while returning the other copy to the clerk. Plaintiffs therefore properly served defendants under § 1608(a)(4).

### 2. Fifth-Amendment Requirements.

The Due Process Clause of the Fifth Amendment to the U.S. Constitution mandates that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." In civil cases against persons, then, the Due Process Clause "requires that if the defendant 'be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted)). "In the absence of such contacts, the liberty interest protected by the Due Process Clause shields the defendant from the burden of litigating in that forum." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985)). Whether this minimum-contacts requirement applies to defendants sued under the FSIA depends on whether such defendants are persons under the Due Process Clause.

Concerning foreign states themselves, this Circuit has squarely held that "foreign states are not 'persons' protected by the Fifth Amendment." *Id.* at 96. As the Circuit later put it, "as a constitutional matter, there is no constitutional matter." *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003). The Circuit reasoned that "in common usage, the term 'person' does not include the sovereign." *Price*, 294 F.3d at 96 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) (internal quotation omitted)). Moreover, because states of the United States are not persons entitled to the Fifth Amendment Due Process protections, *South Carolina v. Katzenback* 383 U.S. 301, 323–24 (1966), "absent some

compelling reason to treat foreign sovereigns more favorably than 'States of the Union,' it would make no sense to view foreign states as 'persons' under the Due Process Clause," *Price*, 294 F.3d at 96.   Because foreign states themselves are not persons and thus not entitled to Fifth Amendment Due Process Protections, plaintiffs need not show any contacts threshold between Iran and the District of Columbia.

Concerning entities of a foreign state, the issue is whether a state "exerted sufficient control over" the entity "to make it an agent of the [s]tate." *TMR Energy*, 411 F.3d at 301.  If such control is exerted, "then there is no reason to extend to" such entity "a constitutional right that is denied to the sovereign itself." *Id.*[13]  This Circuit has held that "plenary control" by a state over an entity thereof is sufficient to conclude that the entity is not a person under the Fifth Amendment. *Id.*  For example, in *TMR Energy* the State of Ukraine had plenary control over the State Property Fund of Ukraine because the Fund's operations were funded and regulated by, and its leaders were chosen by, the State. *Id.* at 301–02.  MOIS, which operates as the foreign and domestic intelligence agency of Iran, is funded by Iran and operates under the guidance of Iranian Supreme Leader Ayatollah Ali Khamenei.  It is clear, then, that Iran has plenary control of MOIS, which is therefore not a person entitled to Fifth Amendment Due Process protections. Plaintiffs need not show any contacts threshold between MOIS and the District of Columbia.

---

[13] *Price*, which was limited to the issue of personhood of foreign states themselves, "express[ed] no view as to whether other entities that fall within the FSIA's definition of 'foreign state'"—political subdivisions, agencies, and instrumentalities thereof—"could yet be considered persons under the Due Process Clause." 294 F.3d at 99–100.  The later case of *TMR Energy* took on the issue expressly avoided by *Price*, but did so only for agencies and instrumentalities of foreign states.  411 F.3d at 300–02.  The logic of *TMR Energy*, however, applies with equal force to political subdivisions of foreign states: if a foreign state exercises sufficient control over a political subdivision thereof such that the political subdivision may be considered an agent of the state itself, the subdivision-agent is no more a person entitled to Fifth Amendment Due Process than the state-principal.

### 3. Customary International Law.

In previous cases, this Circuit has also considered the effect of customary international law and whether it requires a minimum-contacts-like test. *TMR Energy*, 411 F.3d at 302. According to the Court of Appeals, "[c]ustomary international law comes into play only 'where there is no treaty[] and no controlling executive or legislative act or judicial decision.'" *Id.* (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). "Never does customary international law prevail over a contrary federal statute." *Id.* (citing *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988)). Here, the FSIA and Fifth Amendment jurisprudence control. The Court therefore need not decide whether customary international law would require some contacts threshold between defendants and the District of Columbia; even if it did, it would not apply.

### 4. Conclusions Concerning Personal Jurisdiction.

First, plaintiffs properly served defendants under FSIA-specific rules. Second, defendants are not persons entitled to Fifth Amendment Due Process, making unnecessary any consideration of their contacts with this forum. Third, customary international law, regardless of the extent to which it may call for a minimum-contacts-like test, does not apply. The Court therefore has personal jurisdiction over defendants in these cases.

## V. Liability Under the FSIA-Created Cause of Action.

The FSIA prescribes which individuals or entities are subject to liability under the FSIA-created cause of action, to whom such individuals or entities may be liable, and for what actions such liability may attach. In these cases, both defendants are liable to plaintiffs for acts of extrajudicial killing and the provision of material support and resources for such killing, but are not liable for acts of torture because no such acts were committed.

## A.    Entities Subject to Liability.

The FSIA restricts entities subject to liability under its federal cause of action to (1) a "foreign state [(2)] that is or was a state sponsor of terrorism as described" in the elements concerning the requirement to hear a claim, and (3) "any official, employee, or agent of that foreign state [(4)] while acting within the scope of his or her office, employment, or agency." § 1605A(c). The FSIA also makes clear that "a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." *Id.*

In these cases, the named defendants are Iran and MOIS, both of which are considered a "foreign state," *see* discussion *supra* Part IV.A.2., and both of which were designated state sponsors of terrorism at all times and for reasons giving rise to liability under the FSIA, *see* discussion *supra* Part IV.A.3. Additionally, the bases for the alleged liability of these defendants are actions of their officials, employees, and agents; officials and employees of MOIS funded, technically assisted, and operationally controlled its agents of Hezbollah in planning and carrying out the Beirut bombing. Defendants are therefore subject to liability under the FSIA.

## B.    Individuals to Whom an Entity May Be Liable.

The FSIA prescribes which individuals qualify as those to whom entities subject to liability may be liable. Such individuals include "(1) a national of the United States[;] (2) a member of the armed forces[;] (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment[;] or (4) the legal representative of [any such] person." § 1605A(c). The FSIA Elaborates on the first class of individuals by defining "national of the United States" to mean "a citizen of the United States[] or . . . a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(22);

§ 1605A(h)(5), and the second by defining "armed forces" to mean "the Army, Navy, Air Force, Marine Corps, and Coast Guard," 10 U.S.C. § 101(a)(4); § 1605A(h)(4).

In these consolidated cases, there are three sorts of plaintiffs: survivors of the attack, estates of victims who died in the attack, and family members (or estates thereof) of victims of the attack, some of whom died, some of whom survived. Survivors of the attack were members of the armed forces at the time of the attack. Estates of those who died in the attack are represented by legal representatives of such individuals. The Court is satisfied, based on evidence from special master reports, that the following family-member plaintiffs are U.S. nationals: from *Valore*, Bennie Harris, Rose Harris, Allison Thompson, Isaline Thompson, and Johnny Thompson; and from *Spencer*, Lynne Michol Spencer. The Court presumes that all other family-member plaintiffs are U.S. nationals (or that estate-plaintiffs of deceased family members are legal representatives of deceased U.S. nationals), but will require that these plaintiffs provide evidence satisfactory to the Court to corroborate that presumption. All plaintiffs are, therefore, individuals to whom defendants may be liable under the FSIA-created cause of action.

**C.      Defendant's Liability in These Cases.**

Under the FSIA terrorism exception, foreign states are liable for (1) any "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency"; (2) where such act is committed or provision provided by "that foreign state, or of an official, employee, or agent of that foreign state"; (3) which "caused [(4)] personal injury or death"; and (5) "for which Courts of the United States may main jurisdiction for money damages."  § 1605A(a)(1), (c).  When viewed together, the third and fourth elements of this

FSIA-created general cause of action require plaintiffs to prove a theory of liability under which

defendants cause the requisite injury or death.

### 1.      Acts for Which Defendants Are Liable.

First, concerning acts for which defendants may be liable, plaintiffs plead three: torture,

extrajudicial killing, and the provision of material support and resources therefor.  The FSIA

provides definitions of these acts, which guide the analysis of whether such acts occurred with

respect to the Beirut bombing.  As discussed below, defendants committed acts of extrajudicial

killing and provided material support and resources for such killing, but defendants did not

commit torture.

> "[T]orture" means [(1)]any act, [(2)] directed against an individual in the
> offender's custody or physical control, [(3)] by which severe pain or suffering
> (other than pain or suffering arising only from or inherent in, or incidental to,
> lawful sanctions), whether physical or mental, [(4)] is intentionally inflicted on
> that individual [(5)] for such purposes as obtaining from that individual or a third
> person information or a confession, punishing that individual for an act that
> individual or a third person has committed or is suspected of having committed,
> intimidating or coercing that individual or a third person, or for any reason based
> on discrimination of any kind.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(b), 106 Stat. 73, 73 (1992);

§ 1605A(h)(7).  *See generally* 44B Aм. Jur. 2d *International Law* § 152.  For example, the six-

year imprisonment of; beating of; and deprivation of food, light, toilet facilities, and medical care

to an American professor at a Lebanese university constituted torture.  *Sutherland v. Islamic

Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001) (Lamberth, J.).  Similarly, depriving a

hostage "of adequate food, light, toilet facilities, and medical care for 564 days amounts to

torture."  *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001) (Lamberth, J.).

The facts of these cases, however, do not support a similar conclusion.  Unlike in *Sutherland* and

*Jenco*, the defendants here never had custody or physical control over the victims of the Beirut

bombing.  Hezbollah did not kidnap or imprison the soldiers of the 24th MAU; indeed, the

contact between Iranian agents and the victims in these cases was fleeting—only the time it took

to drive an explosives-laden truck into a building.  The Beirut bombing, therefore, does not

constitute torture under the FSIA.

> "[E]xtrajudicial killing" means a [(1)] deliberated killing [(2)] not authorized by a previous judgment pronounced by a regularly constituted court [(3)] affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  [(4)] Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992);

§ 1605A(h)(7).  As this Court has previously found, and now reconfirms, Hezbollah, Iran, and

MOIS deliberately killed 241 American military servicemen in the Beirut bombing.  *Peterson I*,

264 F. Supp. 2d at 61.  They in no way acted as a regularly constituted court and had no

authority to authorize such killings.  *Id.*  Indeed, through their use of terroristic violence

defendants acted contrary to, not in conformity with, those guarantees recognized as

indispensable by civilized people.  The Beirut bombing, therefore, constitutes extrajudicial

killing.

> "[M]aterial support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); § 1605A(h)(3).  Regarding financing, "[t]his Court has determined that

'the routine provision of financial assistance to a terrorist group in support of its terrorist

activities constitutes providing material support and resources for a terrorist act within the

meaning of the [terrorism exception of the FSIA].'"  *In re Islamic Republic of Iran Terrorism*

*Litig.*, 659 F. Supp. 2d (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 19 (D.D.C.

1998) (internal quotation omitted) (Lamberth, J.)).  Additionally, this Court has found that "a

plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises." *Id.* (quoting *Flatow*, 999 F. Supp. at 19).  As this Court has previously found, and now reconfirms, Iran and MOIS, through their officials and employees, provided financial support and technical expertise to Hezbollah, which, acting at the behest and under the operational control of defendants, was an agent of defendants.  *Peterson I*, 264 F. Supp. 2d at 60–61.  Further, such provision was done within the scope of the officers' office, employees' employment, and Hezbollah's agency: the goal of all involved was to support the execution of terrorist violence against the United States. Defendants, therefore, provided material support and resources for the Beirut bombing.

### 2.    Entities Liable.

Second, concerning the entity that committed the act or provided the provision of material support and resources therefor, the wording of the FSIA is, at times, repetitive.  Here, the section setting forth the elements of the federal cause of action specifies that liability for "acts described in subsection (a)(1)" of the FSIA terrorism exception shall apply only where such acts are committed by "that foreign state, or of an official, employee, or agent of that foreign state."  § 1605A(c)  One of the acts in subsection (a)(1) is the provision of material support or resources for another act, such as extrajudicial killing, but only where such provision is be made "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  § 1605A(a)(1).  The result is that, in the analysis of liability for the provision of material support for extrajudicial killing, the lines are blurred.  The definition of such provision includes not only the provision itself, but requires that the provision be made by a foreign state or an official, employee, of agent thereof.  The second element then again requires that the act for which liability attaches—here, provision—be committed by a foreign state or an official, employee, or agent thereof.  But in the analysis of liability for extrajudicial

killing, the first element—the act—and the second element—the actor—are not repetitive. The definition of extrajudicial killing does not specify that the killer be a foreign state or an official, employee, or agent thereof; that part is left to the second element.

Thus, in the paragraphs above concerning the first element of liability for provision, the court has already concluded that officials, employees, and agents of defendants provided material support and resources to Hezbollah, and did so within the scope of their office, employment, and agency. As to the second element, then, the Court concludes once more that such provision was made by officials, employees, and agents of defendants. Concerning extrajudicial killing, the Court similarly concludes that Hezbollah, because it acted at the behest and under the operational control of defendants, acted as agents of defendants. Defendants are therefore liable because the extrajudicial killing and provision of material support and resources were committed by officials, employees, and agents of Iran and MOIS. *Peterson I*, 264 F. Supp. 2d at 60–61. Or, as one keen eyewitness to the attack put it the day after the bombing: "The Iranians have blood on their hands. The terrorists were too well equipped. You don't go to a local drug store and buy a couple of tons of TNT. That takes the support of a government." PETIT, *supra* note 7, at 202.

### 3.    Causation and Injury Generally.

As discussed above, there is no but-for causation requirement under the FSIA; proximate causation is sufficient. *See* discussion *supra* Part IV.A.2. The Court then noted that plaintiffs had alleged several connections between defendants and the attack: Iran's high level technical participation facilitated the construction and deployment of the bomb so as to maximize its destructive effect, defendants ordered the attack and oversaw its operation, and Iran financially supported Hezbollah. *See id*.

Above, the court only considered these connections as allegations; now, it finds once again that these allegations are true. *See Peterson I*, 264 F. Supp. 2d at 58. "[I]t is beyond

question that Hezbollah and its agents received massive material and technical support from the Iranian government." *Id.* "The sophistication demonstrated in the placement of an explosive charge in the center of the Marine barracks building and the devastating effect of the detonation of the charge indicates that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran." *Id.* The Court therefore concludes that these connections constitute proximate causation of plaintiffs' injuries, to the extent that they actually suffered such injuries under a theory of recovery advanced by plaintiffs.

In these cases, servicemen who survived the attack advance theories of liability of assault, battery, and intentional infliction of emotional distress; estates of servicemen who did not survive advance similar theories in a survival action; estates of such servicemen also advance wrongful-death theories of recovery; and family members of such servicemen advance theories of intentional infliction of emotional distress. The Court is presented with the difficulty of evaluating these claims under the FSIA-created cause of action, which does not spell out the elements of these claims that the Court should apply. Thus, the Court "is forced . . . to apply general principles of tort law—an approach that in effect looks no different from one that explicitly applies federal common law"—but "because these actions arise solely from statutory rights, they are not in theory matters of federal common law." *Heiser v Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (Lamberth, C.J.) [hereinafter *Heiser II*]. The Court of Appeals addressed this difficulty in *Bettis v. Islamic Republic of Iran*:

> The term "federal common law" seems to us to be a misnomer. Indeed, it is a mistake, we think, to label actions under the FSIA and Flatow Amendment for solatium damages as "federal common law" cases, for these actions are based on statutory rights. . . . Rather, . . . because the FSIA instructs that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.

315 F.3d 325, 333 (D.C. Cir. 2003).  District courts thus look to Restatements, among other sources, "to find and apply what are generally considered to be the well-established standards of state common law."  *Heiser II*, 659 F. Supp. 2d at 24.  The Court will therefore now "turn to the Restatement (Second) of Torts 'as a proxy for state common law.'"  *Id.* (quoting *Bettis*, 315 F. 3d at 333; citing *Sutherland*, 151 F. Supp. 2d at 48–50 (applying the Restatement to several tort claims).

### 4        Claims Brought by Survivors of the Attack: Assault, Battery, and IIED.

Survivors of the Beirut bombing have alleged assault, battery, and IIED in *Valore* and *Spencer*.  Defendants are liable under all three theories to these plaintiffs, except Floyd Carpenter, who the Court must dismiss without prejudice for want of prosecution.

Iran is liable for assault in these cases if, when it committed extrajudicial killing or provided material support and resources therefor, (1) it acted "intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) those attacked were "thereby put in such imminent apprehension."  RESTATEMENT (SECOND) OF TORTS § 21(1).  It is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm.  Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, the Court concludes that defendants are liable for assault.

Survivors have also alleged battery in *Valore* and *Spencer*.  Iran is liable for battery in these cases if, when it committed extrajudicial killing or provided material support and resources therefor, it acted "intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those

attacked "directly or indirectly result[ed]." RESTATEMENT (SECOND) OF TORTS § 13. Harmful contact is that which results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15. Again, it is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm. Accepting these plaintiffs' uncontroverted assertions that they did, in fact, suffer severe physical injury from the blast, the Court concludes that defendants are liable for battery.

Finally, survivors have also alleged IIED in *Valore* and *Spencer*. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." RESTATEMENT (SECOND) OF TORTS § 46(1). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Accepting these plaintiffs' uncontroverted assertions that they did, in fact, suffer severe emotional and physical injury, the Court concludes that defendants are liable for IIED.

The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited. *See, e.g.*, *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d. 1, 13 (D.D.C. 2008) (prohibiting double recovery for both IIED and wrongful death) (Lamberth, C.J.). The Court considers the amount of recovery to which these plaintiffs are entitled in the section on damages below.

### 5. Claims Brought by Estates of Decedents as Survival Actions.

A survival action is one that accrued in a decedent's favor before his death that may be brought after his death by his estate; in other words, it is a claim that could have been brought by

the decedent, had he lived to bring it.  *See* RESTATEMENT (SECOND) OF TORTS § 926; *see, e.g.*,

*Peterson II*, 515 F. Supp. 2d at 53 (evaluating claims brought by decedents' estates "for pain and

suffering incurred during the time at which they were alive after the attack and the time at which

they died").  Only two estate-plaintiffs have brought such claims under the FSIA-created cause

of action, one in *Arnold* and one in *Spencer*, alleging pain and suffering stemming from assault,

battery, and IIED.  These plaintiffs are the Estate of Moses Arnold, Jr., and the Estate of James

Silvia.

      For both of these plaintiffs, special masters who took evidence in these cases were unable

to conclude that decedents' deaths were anything but instantaneous.  The Court is thus

constrained by the rule that "[i]f death was instantaneous there can be no recovery . . . for pain

and suffering" of the decedent.  *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112

(D.D.C. 2000) (citation omitted).  *Cf. Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1

(D.D.C. 2000) (awarding damages to estates of decedents who endured several minutes of pain

and suffering prior to death) (Lamberth, J.); *Flatow*, 999 F. Supp. 1 (awarding damages to estates

of decedents who endured several hours of pain and suffering prior to death).  The Court must

therefore dismiss these plaintiffs' survival claims with prejudice.

      **6.**     **Claims Brought by Estates of Decedents for Wrongful Death.**

      A wrongful-death action is one brought by a decedent's heirs at law, and may be brought

through the estate of the decedent, "for economic losses which result from a decedent's

premature death."  *Flatow*, 999 F. Supp. at 27.  Only two estate-plaintiffs have brought such

claims under the FSIA-created cause of action, one in *Arnold* and one in *Spencer*.  These

plaintiffs are the Estate of Moses Arnold, Jr., and the Estate of James Silvia.  Because defendants

are liable for the deaths of the decedents, defendants are also liable for the economic damages

caused to decedents' estates.  The Court considers the amount of recovery to which these plaintiffs are entitled in the section on damages below.

### 7.     Claims Brought by Family Members of Victims for IIED.

Several family members of and estates of decedents have brought IIED claims, alleging that extreme and outrageous conduct directed at third-person relatives caused these plaintiffs severe emotional distress.  The Court notes at the outset that these claims are invalid where made by estates on behalf of beneficiaries thereof.  Several estate-plaintiffs have alleged that defendants are liable for intentional infliction of emotional distress to various decedents' heirs at law, but these heirs are not named plaintiffs—only the estates are.  The only type of IIED claim an estate can make is one for the decedent himself as a survival action.  (Two estate-plaintiffs from *Bonk*—Estate of Rose Rotondo and Estate of Luis Rotondo—make valid IIED claims as survival actions.)  Solatium, the sort of damages sought for IIED, "is traditionally a compensatory damage which belongs to the individual heir personally."  *Flatow*, 999 F. Supp. at 29.  The Court cannot award damages to non-party heirs for IIED alleged by such heirs. Accordingly, the Court must dismiss claims brought by estates for IIED allegedly suffered by estates' beneficiaries.[14]

As for other individually named family-member plaintiffs and estate-plaintiffs pursing survival actions, according to the Restatement, Iran is liable in these cases under such claims if it (1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members—the immediate-family

---

[14] The Court notes that these beneficiaries could pursue IIED claims as individually named plaintiffs in another suit, so long as any such suit would satisfy the relatedness requirements of § 1083(c), discussed *supra* Part II.A., and the temporal limitations of § 1605A(b) and § 1083(c), discussed *supra* Part IV.A.4.

requirement—who were present at the time such conduct occurred—the presence requirement.

RESTATEMENT (SECOND) OF TORTS § 46(1)–(2)(a). Although this fourth element appears to prohibit recovery for emotional injury by those not in the immediate family of the person to whom extreme and outrageous conduct is directed or by those who are not present at the time such conduct occurs, the drafters of the Restatement include a caveat: "The [American Law] Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress." RESTATEMENT (SECOND) OF TORTS § 46 Caveat. In other words, there may be instances where it is appropriate to permit recovery by individuals not satisfying the immediate-family or presence requirements.

Plaintiffs have easily proven the first three elements. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress," *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)), and the conduct was directed at decedents, not plaintiffs. The immediate-family and presence requirements, however, require more discussion.

This Court has previously "adopted the strict meaning of 'immediately family,' defined as one's spouse, parents, siblings, and children." *Heiser II*, 659 F. Supp. 2d at 28 (citing *Jenco*, 54 F. Supp. 2d at 36 n.8). This definition, which is "consistent with the traditional understanding of one's immediate family," *id.*, does not include "'family members,' 'near relatives,' 'close associates,' or persons with whom the victim has 'close emotional ties,'" *Bettis*, 315 F.3d at 336. It does include, however, immediate family members of the half blood, as "[s]iblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would." *Peterson II*, 515 F. Supp. 2d at 52.

Nieces, nephews, aunts, and uncles, therefore, are not members of one's immediate family. *Heiser II*, 659 F. Supp. 2d at 28; *Peterson II*, 515 F. Supp. 2d at 52. Neither are non-adoptive stepparents or non-adopted stepchildren. *Heiser II*, 659 F. Supp. 2d at 29; *Peterson II*, 515 F. Supp. 2d at 47, 49. But, in accordance with the Restatement's caveat, and as this Circuit has noted, "some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover for negligent infliction of emotional distress" where such relatives did not satisfy the immediate-family requirement. *Bettis*, 315 F.3d at 337 (emphasis in original) (citing *Sullivan v. Ford Motor Co.,* No. 97-cv-593, 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000); *Garcia v. San Antonio Housing Auth.*, 859 S.W.2d 78, 81 (Tex. Ct. App. 1993); *Kriventsov v. San Rafael Taxicabs, Inc.,* 186 Cal. App. 3d 1445 (Cal Ct. App. 1986)). The Court of Appeals reasoned that where claimants "were members of the victim's household" such that they were "viewed as the functional equivalents of family members," the immediate-family requirement could potentially be stretched to include nieces and nephews, aunts and uncles, non-adoptive stepparents, non-adopted stepchildren, and stepsiblings. *Id.* The mere existence of a "close relationship" between a claimant who is a non-immediate family member and the victim, however, falls "far short of what § 46(2)(a) requires." *Id.* Several plaintiffs in *Bonk* do not fall within the traditional definition of immediate family. The Court will now evaluate whether such plaintiffs are functional equivalents of immediate family members.

Concerning Carl Kirkwood, Sr., it is unclear from the special-master report whether Mr. Kirkwood, Sr., was the adoptive or non-adoptive stepfather of decedent James E. McDonough. In either case, Mr. Kirkwood, Sr., satisfies the immediate-family requirement. If an adoptive stepfather, he is treated as though the natural father. If a non-adoptive stepfather, the special master in this case who recommended damages relating to Mr. McDonough's death reported that

Mr. Kirkwood, Sr., considered Mr. McDonough to be his son and vice versa. Mr. Kirkwood, Sr., would hunt and fish with Mr. McDonough, who he treated as his own son. Because Mr. McDonough grew up with Mr. Kirkwood, Sr., as though they constituted a natural family, the Court concludes that Mr. Kirkwood, Sr., if non-adoptive, was the functional equivalent of a father.

Concerning Carl Kirkwood, Jr., it is unclear from the special-master report whether Mr. Kirkwood, Jr., was the half-brother or stepbrother of Mr. McDonough. In either case, Mr. Kirkwood, Jr., satisfies the immediate-family requirement. If a half-brother, he is treated as though a full-blood relative. If a stepbrother, Mr. Kirkwood, Jr., who remembers fishing and swimming with and was treated like a brother by Mr. McDonough, is the functional equivalent of a brother.

Danielle DiGiovanni, Lisa DiGiovanni, and Robert DiGiovanni were the nieces and uncle, respectively, of decedent Luis J. Rotondo. The special master has not reported any evidence that these non-immediate family members were members of Mr. Rotondo's household such that they were the functional equivalent of immediate family members of Mr. Rotondo. These three plaintiffs therefore lack standing to bring a claim for IIED under the FSIA and their claims must be dismissed.

All other plaintiffs bringing this claim suffered a legally cognizable injury under the FSIA. The relationships of each of these plaintiffs to their family members who were victims of the attack are identified in the tables in the separate Order and Judgment issued this date.

Concerning the presence requirement, the Restatement's caveat "suggests that . . . '[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'" *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834

(2000)).  As this Court recently noted, "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily." *Id.*  One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result.  These plaintiffs, although not present at the Beirut bombing, may therefore recover for the emotional injuries they suffered as a result of that attack.

        **D.**        **Jurisdiction.**

In satisfaction of the final element of the FSIA-created cause of action, the Court has jurisdiction over these cases, *see* discussion *supra* Part IV., for money damages, *see* discussion *infra* Part VII.

        **E.**        **Conclusions Concerning Liability Under the FSIA-Created Cause of Action.**

In these cases, both defendants are considered a foreign state and were and are designated state sponsors of terrorism at all times and for reasons giving rise to liability under the FSIA.  Additionally, the bases for the alleged liability of these defendants are actions of their officials, employees, and agents.  Defendants are therefore subject to liability under the FSIA-created cause of action.  Further, plaintiffs are or were members of the armed forces, nationals of the United States, or legal representatives of such persons.  Plaintiffs therefore fall into a class of individuals to whom defendants may be liable.  Finally, though not liable for torture, defendants are liable for extrajudicial killing and the provision of material support and resources for such killing, which was committed by officials, employees, and agents of defendants; which caused injury under several theories of liability; and for which the Court has jurisdiction for money damages.  Therefore, those plaintiffs who have made claims under the FSIA-created cause of action may recover the appropriate amount of damages as determined by the Court *infra* Part VII.

## VI.    Liability Under District of Columbia Law.

Plaintiffs in *Valore* continue to pursue survival actions and wrongful-death claims under

District of Columbia law, despite the availability of similar actions and claims under the FSIA-

created cause of action.  The Court, therefore, now evaluates these claims under D.C. law.[15]

### A.    Survivor Actions.

According to D.C. law: "On the death of a person in whose favor or against whom a right

of action has accrued for any cause prior to his death, the right of action, for all such cases,

survives in favor of or against the legal representative of the deceased."  D.C. CODE § 12-101.  In

other words, in the District of Columbia, a decedent's estate may pursue after the decedent's

death a claim the decedent could have pursued but for his death.  *See, e.g.*, *Peterson II*, 515 F.

Supp. 2d at 53 (evaluating claims brought by decedents' estates "for pain and suffering incurred

during the time at which they were alive after the attack and the time at which they died").

For all of these plaintiffs, special masters who took evidence in this case were unable to

conclude that decedents' deaths were anything but instantaneous.  The Court is thus constrained

by the rule that "[i]f death was instantaneous there can be no recovery . . . for pain and suffering"

of the decedent.  *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000)

(citation omitted).  *Cf. Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000)

(awarding damages to estates of decedents who endured several minutes of pain and suffering

_____

[15] Although the FSIA terrorism exception now includes an independent federal cause of action, § 1605A(c), plaintiffs may still pursue claims based on law of states of the United States or foreign nations in federal court under the FSIA terrorism exception's jurisdiction-conferring provisions, § 1605A(a)–(b).  For example, another Court of this District recently evaluated a wrongful-death claim brought under the FSIA-created cause of action, but noted that plaintiffs in that case also alleged wrongful death under law of the District of Columbia and the State of Israel.  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22–23 (D.D.C. 2009).  The Court in *Belkin* proceeded under only the FSIA-created cause of action merely because concern for multiple recovery prevented the Court from proceeding under all three, not because the existence of the FSIA-created cause of action prevents plaintiffs from proceeding under state or foreign law.  *Id.*

prior to death) (Lamberth, J.); *Flatow*, 999 F. Supp. 1 (awarding damages to estates of decedents who endured several hours of pain and suffering prior to death).  The Court must therefore dismiss these plaintiffs' survival claims with prejudice.

### B. Wrongful-death Claims.

According to D.C. law:

> When, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is married or domestic partnered, entitle the spouse or domestic partner, either separately or by joining with the injured person, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

D.C. CODE § 16-2701(a).  In other words, a decedent's heirs may pursue claims for "for economic losses which result from a decedent's premature death."  *Flatow*, 999 F. Supp. at 27. However, the D.C. Wrongful Death Act contains an explicit geographic limitation to "injury done or happening within the limits of the District" causing death for which a wrongful-death action may be pursued.  § 16-2701(a).

The Court recognizes that it has, along with other courts of this District, previously permitted recovery under § 16-2701 in cases brought under the FSIA terrorism exception for deaths resulting from injuries inflicted beyond the borders of the District.  *See, e.g.*, *Ben-Rafael*, 540 F. Supp. 2d at 58–59; *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85 (2006) (D.D.C. 2006) (Lamberth, J.); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (2001).  Prior to the creation of an independent federal cause of action under § 1605A, it may have been permissible for courts to give effect to Congress' intent that foreign nations be held liable for the terrorist activities in which they engage by permitting recovery under state tort law "even though a literal reading of the text may arguably bar recovery."  *Ben-Rafael*, 540 F. Supp.

2d at 58.  In the wake of the enactment of the independent federal cause of action in § 1605A, however, such a construction must be avoided.

Because the injuries causing the deaths underpinning these plaintiffs' wrongful-death claims occurred in Beirut, Lebanon, which is well beyond the boundaries of the District of Columbia, the Court must conclude that consideration of plaintiffs' claims solely under § 16-2701 would deny these plaintiffs recovery.  But plaintiffs are in luck: as this Court recently noted, "[t]o the extent that the complaint continues to assert District of Columbia law, this Court has in the past recognized that the laws of this District are an appropriate model for the development of a federal standard with respect to liability in actions against state sponsors of terrorism."  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 100 (citing *Flatow*, 999 F. Supp. at 15 n.6.  The Court therefore concluded that *Valore* "may now proceed under § 1605A."  Accordingly, the Court construes plaintiffs' wrongful-death claims as though pled under § 1605A, not § 16-2701.  Because defendants are liable for the deaths of decedents, defendants are also liable for the economic damages caused to decedents' estates.

### C.     Conclusions Concerning Liability Under District of Columbia Law.

Estate-plaintiffs in *Valore* pursued survival actions and wrongful-death claims under District of Columbia law.  Concerning survival actions, because there is no evidence of pain and suffering to decedents between their injuries and deaths, claims seeking damages for such pain and suffering must be dismissed.  Concerning wrongful-death claims, although plaintiffs are not eligible to recover under D.C. law due to the geographic limitations thereof, the Court construes plaintiffs' claims under § 1605A, permitting recovery for economic damages caused to decedents' estates by decedents' wrongful deaths.  Therefore, those plaintiffs in *Valore* who have made wrongful-death claims may recover the appropriate amount of damages as determined by the Court *infra* Part VII

## VII. Damages.

The Court hereby adopts, just as it did in *Peterson*, all facts found and recommendations made by the special masters relating to all plaintiffs in these cases,[16] except "to the extent that the special masters have awarded a plaintiff more or less than the aforementioned respective award amounts based upon the plaintiff's relation to the serviceman." *Peterson II*, 515 F. Supp. 2d at 52–53. Where recommendations deviate from the Court's damages framework, "those amounts shall be altered so as to conform with the respective award amounts set forth" in the framework, unless otherwise noted. *Id.* at 53.

Most plaintiffs alleged in their complaints claims under the FSIA-created cause of action. Those that did not so allege either petitioned the Court to construe claims initially brought under state law as though they had been brought under § 1605A, *see supra* notes 2–3 (all claims in *Spencer*), or were given a saving construction to their claims brought under D.C. law as though they had been brought under § 1605A, *see* discussion *supra* Part VI.B. (wrongful-death claims in *Valore*). Therefore, all damages awarded in these consolidated cases are awarded under the FSIA-created cause of action.

### A.    Damages Available Under the FSIA-Created Cause of Action.

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c). Accordingly, those who

---

[16] Note that in *Bonk*, the reports were originally filed in Peterson, the case from which several plaintiffs in *Bonk* were dismissed; they have not been filed by special masters appointed in *Bonk*. The Court, therefore, hereby takes judicial notice of these reports. In so doing, the Court "look[s] at the contents of the [m]asters' [r]eport[s] in an evidentiary fashion." *In re A.H. Robins Co.*, 107 F.R.D. 2, 10 (D. Kan. 1985).

Note also that several reports in these consolidated cases contain findings and recommendations concerning individuals who, for whatever reasons, are not plaintiffs currently before the Court. The Court thus restricts its adoption of facts found and recommendations made to only those found and made about plaintiffs in these cases.

survived the attack can recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages.

"To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar*, 370 F. Supp. 2d at 115–16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)). As discussed above, plaintiffs have proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to—and indeed intended to—cause injury to plaintiffs. The Court now discusses reasonable estimates of the different damages sought under the FSIA-created cause of action. The damages awarded are laid out in the tables in the separate Order and Judgment issued this date.

### B. Damages Awarded in These Consolidated Cases.

#### 1. Pain and Suffering of Survivors.

Damages for surviving victims are determined based upon an assessment of such factors as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II*, 515 F. Supp. 2d at 52 n.26 (quotation omitted). "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Peterson II*, 515 F. Supp. 2d at 54. Thus in *Peterson*, the Court granted a baseline award of $5 million to individuals suffering such physical injuries as compound

fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Id.* The Court was willing to depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead, as was one soldier who " was placed in a body bag [and] buried alive in a morgue for four days until someone heard him moaning in pain." *Id.* Similarly, the Court was willing to depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire. *Id.* With these considerations in mind, the Court now considers whether departures recommended by the special masters are warranted.

### a.    Upward Departures.

Only one upward departure is warranted among these claims, for Terance J. Valore in *Valore*. Mr. Valore suffered particularly horrendous physical injuries, in both number and severity. Immediately after the blast, Mr. Valore lost consciousness for about 30 seconds. He regained consciousness to find his skin hanging from his body; severe hole-like wounds passing through his chest; pieces of metal, concrete, and glass embedded in his body; and his leg split open. Mr. Valore had been in the middle of the fireball. His clothes had been blown off, all of hair the on his body had been burned off, and burns covered 90% of his body. The special master recommended a significant departure from $5 million to $10 million for Mr. Valore. Although the Court finds that the number and severity of Mr. Valore's injuries warrant an upward departure, the Court also finds that a doubling of the award would be excessive. Accordingly, and in conformity with similar awards made in *Peterson*, the Court will depart up from $5,000,000.00 to $7,500,000.00.

### b.    Downward Departures.

Only one downward departure is warranted among these claims, for Donald R. Pontillo in *Valore.* The force of the explosion knocked Mr. Pontillo to the ground, but because he was about 150–200 feet from the explosion, he was fortunate to not have been seriously physically injured. His injuries were instead primarily emotional, based on his experience doing what he could to help in the time immediately after the attack. Mr. Pontillo helped pull about 100 men from the debris of the exploded building. One of these men begged him not to leave the man's side. Mr. Pontillo assured the man he would return, but when he did, the man was dead. Mr. Pontillo later visited the hanger that had been turned into a makeshift morgue to search for survivors he hoped had been mistaken for dead. He found one individual who appeared to be smiling, but quickly realized the man was dead; the entire back of the man's head was gone. He broke down crying. Some days later, Mr. Pontillo tried to free a dead body from the rubble by pulling it from the legs. Upon hearing and feeling a suctioning sound, Mr. Pontillo realized the leg had come off in his hands. He vomited. The Court concludes that Mr. Pontillo's suffered severe emotional injuries, but considering his lack of severe physical injuries, the Court will heed the special master's recommendation to depart down from $5,000,000.00 to $1,500,000.00.

### c.    Unwarranted Departures.

The recommendations made by special master for Michael Harris in *Valore* did not conform to the Court's damages framework, but there the master has presented no evidence of aggravating circumstances warranting a departure from that framework. Accordingly, the Court will award Mr. Harris damages in conformity with that framework.

### 2. Economic Loss to Survivors.

In addition to pain and suffering, several plaintiffs who survived the attack, all in *Valore*, proved to the satisfaction of the special master, and thus to the satisfaction of the Court, lost wages resulting from permanent and debilitating injuries suffered in the attack.

### 3. Economic Loss to Estates.

Several estates, including those from *Valore* the claims of which have been construed under § 1605A, have proven to the satisfaction of the special master, and thus to the satisfaction of the Court, loss of accretions to the estate resulting from the wrongful death of decedents in the attack.

### 4. Solatium to Family Members.

Under the FSIA, a solatium claim is indistinguishable from an IIED claim. *Heiser II*, 659 F. Supp. 2d at 27 n.4. Solatium is awarded to compensate the "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Belkin*, 667 F. Supp. 2d at 22 (citing *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196–97 (D.D.C. 2003); *Elahi*, 124 F. Supp. 2d at 110). "In determining the appropriate award of damages for solatium, the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium." *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) (citing *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.)) (Lamberth, C.J.).

In *Peterson*, the action to which these cases is most closely related, this Court adopted the framework set forth in *Heiser* as "an appropriate measure of damages for the family members of victims who died" in the Beirut bombing. *Peterson II*, 515 F. Supp. 2d at 51 (citing *Heiser I*,

466 F. Supp. 2d at 271–356).  That framework awarded valid claims brought by spouses, parents, and siblings of deceased servicemen $8 million, $5 million, and $2.5 million each, respectively. Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased: $4 million for spouses, $2.5 million for parents, and $1.25 million for siblings.  Although "the loss suffered" by family members of victims "is undeniably difficult to quantify," *Heiser I*, 466 F. Supp. 2d at 269, a review of similar cases shows that the damages framework as laid out in *Peterson* has strong precedential support, *see, e.g.*, *Brewer*, 664 F. Supp. 2d at 57–58; *Heiser II*, 659 F. Supp. 2d at 27 n.4; *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000); *Eisenfeld*, 172 F. Supp. 2d at 10–11; *Flatow*, 999 F. Supp. at 29–32.

These numbers, however, are not set in stone.  The Court may award greater amounts in cases "with aggravating circumstances," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006) (Lamberth, J.), indicated by such things as "[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence" or "[m]edical treatment for depression and related affective disorders," *Flatow*, 999 F. Supp. at 31.  Such departures are usually relatively small, absent "circumstances that appreciably worsen" a claimant's "pain and suffering, such as cases involving torture or kidnapping" of the party to whom extreme and outrageous conduct was directed.  *Greenbaum*, 451 F. Supp. 2d at 108 (departing a widower's award upward from $8 million to $9 million upon consideration of "the severity of his pain and suffering due to the loss of his wife and unborn first child").  Conversely, the Court may depart downward in amount where the relationship between the claimant and the decedent is more attenuated.  *See, e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003).  With these considerations in mind, the Court now considers whether departures recommended by the special masters are warranted.

### a.        Upward Departures.

Two plaintiffs' IIED claims warrant upward departure from the damages set forth in the Court's damages framework.  The first such plaintiff, from *Valore*, is Luisa Alvarado.  Ms. Alvarado, sister of surviving victim Pedro Alvarado, Jr., is one of 11 immediate family members of Mr. Alvarado, Jr., who today bring valid IIED claims, but her emotional suffering stands out as particularly devastating.  As the special master reported, Ms. Alvarado has suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered.  The special master recommended that Ms. Alvarado be awarded twice the amount ordinarily awarded to sisters of survivors.  Although the Court finds that Ms. Alvarado's uniquely acute suffering warrants an upward departure, the Court also finds that a doubling of the award would be excessive.  Accordingly, the Court will depart up by 25% from $1,250,000.00 to $1,562,500.00.

The second such plaintiff, from *Spencer*, is Lynne Michol Spencer.  Ms. Spencer lost both her husband, Stephen Eugene Spencer, and her brother, James Silvia—the two family members to whom she had the closest personal relationship—in the Beirut bombing.  The tragic double loss has destroyed Ms. Spencer; she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain.  The special master recommended that Mr. Spencer be awarded $1 million more than the $2.5 million ordinarily awarded to siblings of decedents, but also be awarded the $8 million ordinarily awarded to spouses of decedents.  Although the Court finds that Ms. Spencer's uniquely acute suffering qua her brother warrants an upward departure, the Court also finds that a departure amount of $1 million would be excessive.  The Court also concludes, like the special master, that although Ms. Spencer's suffering is particularly profound in light of the loss of both her brother and husband, the fact that her marriage was brief—the Spencers had been married for only six months when Mr. Spencer was

killed—counsels against any upward departure in the award relating to her husband. Accordingly, the Court will depart up by 25% from $2,500,000.00 to $3,125,000.00 in the award relating to Mr. Silvia, but will not depart in the award relating to Mr. Spencer.

### b. Downward Departures.

Two plaintiffs' IIED claims warrant downward departure from the damages set forth in the Court's damages framework. The first such plaintiff, from *Valore*, is Johnny Thompson, brother of Willie G. Thompson, who survived the attack. Johnny did not visit his injured brother for two years after the attack. He explained that he was too busy raising a family of his own and with his own military service to travel from Fort Hood, TX, to Willie's home in South Carolina. During this time, Johnny learned of the progress of Willie's recovery, but he did so from his mother, not Willie himself. It is not clear why, even with family and military obligations, Johnny did not visit or even talk with his brother Willie for some two years after the Beirut bombing. The Court is constrained to conclude, as was the special master, that the relationship between Johnny and Willie was attenuated, warranting a downward departure. The special master recommended a departure from the $1.25 million ordinarily awarded to siblings of survivors to a mere $300,000.00. Despite the attenuation of the brothers' relationship, the Court cannot accept such a drastic departure. Johnny did testify that the bombing severely upset him, so much so that he was given several days of compassionate leave because he was unable to perform his military duties. Accordingly, the Court will depart down by 50% from $1,250,000.00 to $625,000.00.

The second such plaintiff, from *Bonk*, is Evans Hairston, brother of decedent Thomas Hairston. There was a significant age difference between Evans and Thomas; Evans did not attend his brother's wedding and the two lost touch over the years. The Court thus concludes that the brothers' relationship was fairly attenuated. The special master recommended a

downward departure from the $2.5 million ordinarily awarded to siblings of decedents to a mere $1 million. Despite the attenuation of the brothers' relationship, the Court cannot accept such a drastic departure. Evans did testify that he misses "Tommy" and thinks of him often. Accordingly, the Court will depart down by 50% from $2,500,000.00 to $1,250,000.00.

### c.    Unwarranted Departures.

The recommendations made by special masters for the following plaintiffs did not conform to the Court's damages framework, but there the masters have presented no evidence of aggravating circumstances warranting departures from that framework. Accordingly, the Court will award these plaintiffs damages in conformity with the respective award amounts set forth in the Court's damages framework. These plaintiffs are: from *Arnold*, Lolita M. Arnold, Betty J. Bolen, and Sheldon H. Bolen; and from *Bonk*, Kevin Bonk, Thomas Bonk, Marion DiGiovanni, Thomas A. Fluegel, Marilou Fluegel, Catherine Bonk Hunt, Carl Kirkwood, Sr., Patricia Kronenbitter, Estate of Rose Rotondo, and Estate of Luis Rotondo.

### 5.    Punitive Damages.

Punitive damages, only recently made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they awarded. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61; *Heiser II*, 659 F. Supp. 2d at 29–30; *Acosta*, 574 F. Supp. 2d at 30 (citing RESTATEMENT (SECOND) OF TORTS § 908(1)). In determining the proper punitive damages award, courts evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30 (citing *Flatow*, 999 F. Supp. at 32 (citing RESTATEMENT (SECOND) OF TORTS § 908)). The nature of the defendants' acts and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom. *See Bodoff*, 424 F. Supp. 2d at 88 (determining a

bus bombing, for which Iran was held liable, to be "extremely heinous"). "The defendants'
demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is
evidence of the monstrous character of the bombing that inflicted maximum pain and suffering
on innocent people." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C.
2003) (concerning a separate bus bombing for which Iran and MOIS were held liable). As to
deterrence and wealth, Dr. Patrick Clawson, an expert on Iranian terrorism activities, has
testified in several cases on the amounts of punitive damages that would serve to deter Iran from
supporting terrorist activities against nationals of the United States. *See, e.g.*, *Flatow*, 999 F.
Supp. at 32; *Heiser II*, 659 F. Supp. 2d at 30. Two numbers are at issue: the multiplicand—the
amount of Iran's annual expenditures on terrorist activities—and the multiplier—the factor by
which the multiplicand should be multiplied to yield the desired deterrent effect.

　　　As to the multiplicand, Dr. Clawson has previously testified that Iran spends between $50
million and $150 million annually on terrorism activities. *Heiser II*, 659 F. Supp. 2d at 30.

> This range, according to Dr. Clawson, reflects not only a degree of uncertainty
> regarding the precise dollar amount earmarked yearly for terrorists, but more
> significantly, disagreement among experts over what activities constitute
> terrorism in the first place. Though some of the money goes directly to terrorist
> operations, most of it ultimately funds "arms" of the terrorist groups, such as
> hospitals and political organizations, through which the terrorists are able to
> recruit.

*Id.* But Dr. Clawson recently amended his estimate in an affidavit filed in these consolidated
cases: "[T]he financial material support provided by Iran in support of terrorism is in the range of
$300 million to $500 million a year." (Clawson Aff. ¶ 4, Mar. 31, 2010.) Dr. Clawson declared
that in 2008, Iran provided approximately $200 million in direct cash assistance to Hezbollah.
(*Id.* ¶ 3.a. (citing U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM 2008, at 183 (2009),
*available at* http://www.state.gov/documents/organization/122599.pdf ("In 2008, Iran provided
more than $200 million in funding to Lebanese Hizballah . . . .").) Additionally, Dr. Clawson

declared that since 2006, Iran has also provided Hezbollah with "many tens of millions of dollars" worth of sophisticated weaponry, including some 40,000 rockets.

In the past, "[i]n the interest of remaining neutral in the debate on the complicated topic of terrorism financing," the Court has adopted the mean of the range of Dr. Clawson's estimates. *See, e.g.*, *Heiser II*, 659 F. Supp. 2d at 30 (adopting $100 million—the mean of $50 million and $150 million—as the multiplicand). Because the subject of these consolidated cases is terrorism by Iran through Hezbollah, the Court does not simply adopt the mean of Dr. Clawson's estimated range of Iran's funding of terrorism generally. Instead, the Court adopts $200 million as the multiplicand. This value is based on the known amount of Iran's annual cash assistance specifically to Hezbollah and does not require the Court to waver from its neutrality concerning terrorism financing by hazarding a guess as to the value of any non-cash assistance also provided to Hezbollah.

As to the multiplier, Dr. Clawson testified in *Flatow* that a factor of three times Iran's annual expenditures on terrorism "would be the minimum amount in punitive damages that would affect the conduct of the Islamic Republic of Iran, and that a factor of up to ten times its annual expenditure for terrorism must be considered to constitute a serious deterrent to future terrorist activities aimed at United States nationals." 999 F. Supp. at 32. In *Heiser*, however, he recommended a factor between three and five, as opposed to three and ten. 659 F. Supp. 2d at 30. In both cases, the Court conservatively adopted the lower multiplier of each range: three. Today, however, the Court adopts five as the multiplier.

This higher number is based on the suggestion by Dr. Clawson that Iran has recently begun to more actively participate in litigation in the United States and elsewhere. (*See* Clawson Aff. ¶ 6.) For example, in *Rubin v. Islamic Republic of Iran*, Iran intervened to assert sovereign immunity in a case it had previously ignored after the Court ruled that plaintiffs could attach

Iranian archeological artifacts on loan to the University of Chicago.  No. 03-cv-9370, 2006 WL 2024247, at *1 (N.D. Ill. July 14, 2006); (*see* Clawson Aff. ¶ 6).  Additionally, in the Canadian case of *Estate of Kazemi v. Islamic Republic of Iran*, Iran has actively contested the jurisdiction of the Montreal Superior Court, where the case has been filed.  Irwin Block, *Quash Lawsuit: Tehran; Iran Has Immunity, Superior Court Told*, GAZETTE (Montreal), Dec. 3, 2009, at A6; (*see* Clawson Aff. ¶ 6).  In the hopes that Iran is paying more attention to the cases that have been brought against it, the Court seeks to send the strongest possible message that Iran's support of terrorism against citizens of the United States absolutely will not be tolerated by the courts of this nation.  By adopting five as a multiplier, this Court will hold Iran to account.

Multiplying $200 million by five, the Court therefore awards punitive damages in the amount of $1 billion.[17]  This award, like previous awards made under similar methodology,

---

[17] In *Exxon Shipping Co. v. Baker*, the Supreme Court recently limited a punitive damages award to a maximum of a 1:1 ratio with compensatory damages awarded.  128 S. Ct. 2605 (2008).  To the extent that some plaintiffs may share in a punitive damages award higher than their compensatory award, and thus with a ratio of punitive to compensatory damages higher than 1:1, *Exxon* is distinguishable from this case.  First, *Exxon* concerned punitive damages awarded under maritime law, not the FSIA; the Supreme Court explicitly limited its holding, noting that "a 1:1 ratio . . . is a fair upper limit *in such maritime cases*." *Id.* at 2633 (emphasis added).  But more importantly, the Supreme Court decided a case "with no earmarks of exceptional blameworthiness in the punishable spectrum." *Id.*  When "the supertanker Exxon Valdez grounded on Bligh Reef off the Alaskan coast, fracturing its hull and spilling millions of gallons of crude oil into Prince William Sound," the defendants acted recklessly but "without intentional or malicious conduct." *Id.* at 2612, 2631 n.23, 2633.  The Supreme Court left open the possibility that defendants who do act with intent or malice might be subject to higher ratios of punitive to compensatory damages.  See *id.* at 2633.

This is a case where higher ratios are clearly warranted.  Those harboring a deep-seeded and malicious hatred of the United States who intentionally commit terroristic murder of American military servicemen deserve to be punished at a ratio significantly higher than 1:1 with the compensatory damages for which they are otherwise liable.  Moreover, even after Exxon, this District has repeatedly awarded punitive-damages awards in FSIA cases without concern that such damages may have been awarded at a higher ratio than 1:1 with compensatory damages. *See, e.g.*, *Heiser II*, 659 F. Supp. 2d at 30–31; *Acosta*, 574 F. Supp. 2d at 30–31; *Brewer*, 664 F. Supp. 2d at 59 ("There is no reason to depart from settled case law regarding the amount of punitive damages in terrorism cases.").

"seems likely to have a deterrent effect." *Id.* at 31 (multiplying $100 million by three); *Brewer*, 664 F. Supp. 2d at 59 (same).  Although this level of punitive damages is significantly higher than any previously rendered against Iran, the award is justified by the continuing need to punish and deter Iran from its increasing support of terrorism, and is further justified as the product of well settled case law on the methodology by which punitive-damages awards in FSIA cases are calculated.  Accordingly, this $1 billion punitive-damages award shall be apportioned among the plaintiffs in proportion to their relative compensatory-damages awards.

**VIII.   Conclusion.**

Iran and MOIS are responsible for the deaths and injuries of hundreds of American servicemen, are liable for the emotional injuries their family members have suffered as a result, and deserve to be punished to the fullest legal extent possible.  World-renowned Iranian poet Simin Behbahani, in her "Stop Throwing my Country to the Wind," recently implored her nation to "Stop this screaming, mayhem, and bloodshed.  Stop doing what makes God's creatures mourn with tears."  Posting of Mark Memmott to The Two-Way: NPR's News Blog, http://www.npr.org/blogs/thetwo-way (June 26, 2009, 16:30 EST).  The Court sincerely hopes that the compensatory damages awarded today help to alleviate plaintiffs' physical, emotional, and financial injury and that the punitive damages also awarded inspire Iran to heed Ms. Behbahani's words.

A separate Order and Judgment consistent with these findings shall issue this date.


Signed by Royce C. Lamberth, Chief Judge, on March 31, 2010.